**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

JAMES DEAN and STEVE LOPEZ,    )
                                 )
              Plaintiffs,      )
                                 )
       v.               )
                                 )     09 CV 1190
CITY OF CHICAGO, et. al.,      )
                                 )     Judge Kennelly
                                 )
            Defendants.     )     Magistrate Judge Nolan

**PLAINTIFFS' POST-HEARING MEMORANDUM
IN SUPPORT OF MOTION FOR SANCTIONS**

     Plaintiff Steven Lopez, by and through his attorneys, Hamilton Law Office, LLC, and

Plaintiff Dean, by and through one of his attorneys, Christopher Petrarca, respectfully submit the

following memorandum in support of Plaintiff's motion for sanctions:

**<u>INTRODUCTION</u>**

     For many years, the Chicago Police Department (CPD) has been erecting and maintaining

internal barriers designed to make it more difficult for outsiders to discover its police officers'

disciplinary records. CPD and the City of Chicago make little effort to be accurate or complete in

providing information about an officers' complaint history, because when they "mistakenly" fail

to disclose the existence of several sustained complaints, it usually works to their advantage. This

"inability" to provide accurate information about what documents do or do not exist, is part of

CPD's deliberate practice of concealing unfavorable evidence, sometimes even from its own

attorneys, though that is not what occurred in this case.  What occurred in this case, was an

unlikely turn of events that has made this case unique:  defense counsel got caught red-handed

assisting their clients in this long-standing and calculated practice.

On July 26, 2011, retired police Captain William Wallace testified unequivocally at his deposition that he initiated a "confidential investigation" with CPD's Internal Affairs Division (IAD), because he suspected that Defendant Fiorito was engaging in an overtime payroll scam - allegations which mirror the allegations in Plaintiffs' complaint. *Wallace Dep.,* Ex. 1. *During* Wallace's deposition, defense counsel were emailing each other about this confidential investigation now being "out in the open" and lamenting that Wallace did not apparently understand what "confidential" meant. *Lanzito Email String,* Ex. 3. After Wallace's deposition, counsel for Defendant City ("Fahrbach") forwarded these emails to former counsel for Plaintiff, Brendan Shiller, boasting that she had told Fiorito's counsel ("Lanzito") two years ago that he'd better keep Wallace a secret from Plaintiffs' attorneys, and that she was glad she had been there to make sure Wallace "told the truth." *Fahrbach Email String*, Ex. 2. Mr. Shiller then forwarded these emails to Plaintiff Lopez's counsel. *Id.*

These emails reveal that for two years, attorneys from the law firms of Dykema Gossett and Querrey & Harrow conspired together to conceal highly relevant evidence during the litigation of the Fiorito cases. At hearing on Plaintiffs' motion for sanctions, it was clear that this conspiracy (it cannot, in fairness, be called anything else) is still on-going, and this Court's own experiences with the City and its counsel has taught it that this is an isolated event. This case provides this Court with convincing evidence that this is a systemic problem with the Chicago Police Department, the City of Chicago, and these two law firms. Their withholding of highly relevant and discoverable evidence should not be allowed by this Court, and this case presents a rare opportunity where the City's deliberate efforts to conceal unfavorable evidence has been exposed. If a Plaintiff cannot demonstrate an intentional effort to thwart the discovery process in this case -where an email between defense counsels reveal an effort to keep an entire investigation secret - then there is no reason for the Chicago Police Department and the City of Chicago to

2

follow the rules at all. If Defendants can hide evidence without consequences, they will simply continue to do so, because such a practice works to their advantage.

## ARGUMENT

This Court has a wide range of tools available to it for the imposition of sanctions. *Insurance Ben. Admin., Inc. v. Martin*, 871 F.2d 1354, 1359 (7th Cir. 1989). A judge may reprimand a party or attorney either on or off the record. *Id.* He may impose monetary penalties. *Id.* For drastic violations, he may also enter a default judgment. *Maynard v. Nygren*, 372 F.3d 890, 892-93 (7th Cir. 2004); *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir. 1996). The severity of the sanction should be proportional to the severity of the misconduct. *Insurance Ben. Admin., Inc.*, 871 F.2d at 1359. Default judgments should only be ordered where there is a "showing of willfulness, bad faith, or fault on the part of the defaulted party," *Downs*, 78 F.3d at 1257, but bad faith or willfulness need not be present to impose lesser sanctions, *E360 Insight, Inc. v. The Spamhaus Project*, -- F.3d ----, *4 (7th Cir. 2011). Bad faith and willfulness are akin to deliberately intentional or reckless conduct. *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000).

Sanctions under Federal Rules of Civil Procedure 37 and 11, and 28 U.S.C. § 1927 tend to overlap both in concept and in practice. *Insurance Ben. Admin., Inc.,* 871 F.2d at 1361. Section 1927 is reserved for instances where there is technically no violation of the rules but the court nonetheless finds that an attorney or a party acted in bad faith in order to cause delay or to increase the costs of litigation. *Id.* FRCP 11 applies to pleadings, discovery motions, and other filed papers and FRCP 37 is the primary source of authority for sanctions stemming from discovery abuses. *Id.* Finally, this court has the inherent authority to impose sanctions for conduct that abuses the judicial process. *Barnhill v. U.S.*, 11 F.3d 1360, 1367 (7th Cir. 1993). This Court should invoke all or some of these authorities to impose sanctions on Defendants City and

3

Officer Fiorito, as well as their counsel, for the egregious behavior they have displayed in this case.

## I.  DEFENSE COUNSEL HAVE ACTED IN BAD FAITH TO CAUSE DELAY AND INCREASE THE COSTS OF LITIGATION AND THUS SHOULD BE SANCTIONED  PURSUANT TO 28 U.S.C. §1927.

Federal law, and specifically, 28 U.S.C. § 1927 punishes attorneys for " 'unreasonably and vexatiously' multiplying the proceedings, where that attorney has acted in an objectively unreasonable manner by engaging in a 'serious and studied disregard for the orderly process of justice.' " *Insurance Ben. Admin., Inc.,* 871 F.2d at 1360 (quoting *Walter v. Fiorenzo,* 840 F.2d 427, 433 (7th Cir. 1988)).  The Seventh Circuit later defined "vexatious conduct" as "involv[ing] either subjective or objective bad faith." *Pacific Dunlop Holdings, Inc. v. Barosh,* 22 F.3d 113, 120 (1994). Bad faith, apart from intentional conduct, also encompasses extreme negligence or reckless indifference.  *Id.*  Sanctions under this statute are directed at paying the excess costs of litigation that their conduct caused.  *Id.* In other words, attorneys should personally pay the other side for costs incurred that they otherwise would not have.  *Id.*

Defense counsel's actions in this case (and all the other Fiorito cases, for that matter) have been motivated by a desire to conceal evidence, delay the proceedings, drive up the costs of litigation, and avoid for as long as possible, litigating the merits of Plaintiffs' claims. In fact, prior to finding themselves sitting in the witness chair and subject to sanctions, defense counsel clearly found their game of "hide the ball" to be an amusing pastime. An examination of the timeline of events relating to the Fiorito cases reveals a pattern of vexatious conduct designed to multiply and delay litigation in all the Fiorito cases, and defense counsels' emails provide the proof that this conduct was motivated by bad faith. For this unreasonable conduct, this Court should impose sanctions upon both law firms.

### A. Defense Counsel Have Unreasonably And Vexatiously Multiplied The Proceedings

4

Dykema and Querrey attorneys took over the representation of the City and Fiorito in April of 2009. *Sanctions Timeline*, Ex. 31. From the moment these two firms appeared, they made every effort to delay and prevent discovery on the merits of the plaintiffs' claims. *Summary of Fiorito Litigation*, Ex. 30. The case that caused Fahrbach to meet with Captain Wallace was clearly *Fuller v. City of Chicago* (09CV1672)[1]. *Fahrbach, 10/5/11 Sanctions Hrg. Trans.,* Ex. 19, pp. 23:23-25; 37:18-22. In *Fuller*, Judge Hibbler had ordered the parties to exchange 26(a)(1) disclosures by July 3, 2009, and Fiorito's counsel disclosed Wallace. *Id.* Thus, on either July 8, or July 9, 2009, the week before he retired, Fahrbach met with Captain Wallace. *Fahrbach, 10/5/11 Sanctions Hrg. Trans.*, Ex. 19, p. 21:17-24. During that meeting, Fahrbach learned without any doubt that Captain Wallace's potential testimony was harmful to Fiorito and the City and helpful to the plaintiffs, and that Captain Wallace had no intention of lying about it. *Fahrbach, 10/5/11, Sanctions Hrg. Trans.,* Ex. 19, pp. 44:9-45:10. After this meeting, Fahrbach and Lanzito conspired to keep Wallace as secret as they could. *Id.* at 36:22-37:22. They decided not to name Wallace as a witness in any cases, except *Fuller* where it was aleady too late to keep him a secret. *Id.*

In *Fuller,* Defense counsel employed other tactics to divert attention away from Wallace. They filed and litigated motions for protective orders, and a motion to stay. *Summary of Fiorito Litigation*, Ex. 30. When Judge Hibbler finally denied these motions and ordered that discovery proceed, the City quickly settled *Fuller* before Wallace's deposition could be taken. *Id.* To date, the *Fuller* case is one of only two Fiorito cases the City has settled since 2009 when multiple cases were filed against Fiorito.

---

[1] Fahrbach claims her first meeting with Wallace was also motivated by the *Kolinek* case, but she admits Wallace's involvement in *Kolinek* was "[n]othing. He was the commander who signed off on the reports." *Fahrbach*, *Sanctions Hrg*. p. 24:17-20. It is more likely that the main purpose of her meeting with Wallace was because he was a necessary witness in *Fuller* who had just been disclosed to Plaintiff's counsel pursuant to Court order on July 3, 2009.

Meanwhile, in this very case, defense counsel engaged in similar delay tactics. Discovery did not begin in this case until after the protective order was entered in October of 2009. *Id.* Thereafter, the City endeavored to bury Wallace under 8,000 pages of documents, hoping that Plaintiff's counsel would simply be too overwhelmed to discover Wallace or his testimony. Since Plaintiff Lopez's current counsel undertook his representation in April of 2011, Defendant City has continued to engage in repeated vexatious conduct aimed at multiplying and delaying the proceedings, including, but not limited to the following:

*Refusing To Provide or Accept Electronic Copies of Documents*

The undersigned first attempted to obtain documents produced prior to her appearance in this matter by requesting electronic copies of the City's document production from counsel for the City. This request was met by Fahrbach's claim that Dykema Gossett does not have the capability of scanning and producing discovery in electronic form. The undersigned was instead directed to obtain the documents from Plaintiff Lopez's former counsel, a task that was difficult and time-consuming and required several days of poring over boxes of documents at the prior lawyer's firm.

*Referring Plaintiff's Counsel To 3300 pages Left At a Copy Service Seven Months Earlier*

Counsel for Defendant City's first response to current Plaintiff's requests for documents was to simply refer her to over 3300 pages Fahrbach had previously left at a copy service for Plaintiff Lopez's former attorney in November of 2010.[2] See *Fahrbach Letter dated June 13, 2011*, Ex. 21. Fahrbach did not provide the undersigned with any explanation as to where within these 3300 pages the requested documents might be. Plaintiff Lopez's counsel responded the same day pointing out that this response was not reasonable. See *Hamilton Letter of June 17, 2011*, Ex. 22.

---

[2] Plaintiff's counsel has since learned these documents were irrelevant and almost entirely not responsive to her specific document requests. The cost of obtaining these irrelevant documents would have been $330.

*Claiming The City Doesn't Have Documents And Referring*
*Plaintiff's Counsel To "The Court Files" for The Documents Requested*

On June 20, 2011, counsel for the City then changed her position, and claimed that the documents sought by Plaintiff Lopez were not in Defendant City's possession, and referred Plaintiff's counsel to the court files for missing documents. See *Fahrbach Letter dated June 20, 2011*, Ex. 23. On that same date, Plaintiff Lopez's counsel emailed Ms. Fahrbach in an attempt to address this discovery dispute. See *Email String dated June 20, 2011*, Ex. 24.

*Claiming The Documents Had Already Been Produced To Plaintiff's Former Counsel,*
*Or That They Need Not Produce Because They Were Never Requested Before*

On June 27, 2011, counsel for Defendant City sent the undersigned a long response to Plaintiff Lopez's June document requests, but still didn't produce any documents. See *Fahrbach Letter dated June 27, 2011*, Ex. 25. The City argued against producing many of the documents apparently because they had not been previously requested in formal document requests by Plaintiff's former counsel. The undersigned responded by again requesting the missing discovery and explaining its relevance where applicable. See *Hamilton Letter dated July 5, 2011*, Ex. 26.

*Responding To Stale Document Requests Instead Of To Plaintiff's Current June 2011 Requests,*
*And Insisting Plaintiff Draft "Formal" Document Requests To Obtain Any Documents.*

On July 15, 2011, counsel for Defendant City responded to Plaintiff's former counsel's 2009 and early 2010 document requests rather than to the undersigned's specific requests from June, and agreed to produce approximately 750 pages of documents, but required first, that Plaintiff Lopez's counsel submit "formal" requests for certain documents. See *Fahrbach Letter dated July 15, 2011 and enclosed Fifth Supplemental Production Response*, Ex. 27. On July 26, 2011, Plaintiff's counsel confronted Ms. Fahrbach about her requirement of a "formal document request," arguing that her letters were sufficient document requests under the Rules. Ms. Fahrbach insisted that she would not release the documents to Plaintiff's copy service without

"formal" document requests. On the same day, Plaintiff Lopez complied with this baseless requirement just to obtain the discovery.

*Defense Counsel's Actions With Respect To the Wallace Investigation Have Caused Nearly Three Months Of Expensive and Time-Consuming Litigation That Has Nothing To Do With The Merits Of Plaintiffs' Claims.*

As this Court is well aware, defense counsel's concealment of the Wallace investigation has completely derailed this case for months. Plaintiff Lopez's counsel has spent significant time and energy litigating a sanctions motion, and this Court devoted much time and attention to it as well. Counsel has appeared before this Court on this sanctions motion no less than seven times and this Court has had to devote one entire day and part of another, to conduct an evidentiary hearing to this issue. *Case Docket*, Sanctions Ex. 17.

### B. Defense Counsel's Unreasonable Conduct Has Been Undertaken In Bad Faith

The plain meaning of defense counsels' emailed words are evidence bad faith. Defense counsel's failure to immediately inform Plaintiff's counsel that they had supposedly checked for the existence of the Wallace file back in 2009, is evidence of bad faith. Furthermore, though it is certain they did not desire to end up on the witness stand themselves, defense counsel, originally found the Wallace issue amusing, and this too, evidences their bad faith.

At hearing, Farhbach explained why she had wrote "[t]his case is really fun now," in her email to Shiller. Fahrbach explained that she found this case fun because after Wallace's deposition, she knew that Plaintiff's counsel "were going to have to---we were going to have to prove to you there was no file, that there was no investigation, and you were going to have to do a lot of depositions because you wouldn't believe us." *Fahrbach, 10/7/11 Sanctions Hrg. Trans.*, Ex. 20, p. 58:5-22. According to Fahrbach, she forwarded her emails with Lanzito to Shiller because she thought he would "get a kick out of it." *Fahrbach*, 10/5/11 *Sanctions Hrg. Trans.*, Ex. 19, p. 49:16-18. To Fahrbach, the information Wallace had given her was kind of "gobbledlygook." *Id.*

8

at 25:16-20.  To Fahrbach, Lanzito's email "what part of 'confidential' didn't Wallace

understand?" was just "something silly that Dominick said."  *Id.* at 50:4-13. For his part, Lanzito

refers to this same email as "a wisecrack," "tongue and cheek," "sarcastic," "facetious," and he

claims he was "just making a joke." *Lanzito, 10/7/11 Sanctions Hrg. Trans.*, Ex. 20, p. 127:7-24.

Even after it became apparent that she was facing the possibility of sanctions herself,

Fahrbach still seems to have little understanding of the gravity of the situation or to take any

personal responsibility for it.  When questioned whether the two emails strings needed to be

viewed together to be complete, Fahrbach quipped "I don't think they need to be viewed at all."

*Fahrbach, 10/5/11 Sanctions Hrg. Trans.*, Ex. 19, p 48:14.  When asked why she was terminated

from her position with Dykema, rather than admitting that she made a mistake, or violated the

joint defense privilege, Fahrbach testified "I was told that the use of email caused a problem for a

very important partner with a very important client…. Terry Burns and the City of Chicago."

*Fahrbach, 10/5/11 Sanctions Hrg. Trans.,* Ex. 19, pp. 7:25-8:5.

## II. FAHRBACH AND LANZITO ARE SUBJECT TO RULE 11 SANCTIONS FOR FILING MISLEADING MOTION RESPONSES

One of the purposes of Rule 11 sanctions is to "to discourage dilatory and abusive

tactics."  *Cheek v. Doe*, 828 F.2d 395, 397 (7th Cir. 1987).  The rule requires attorneys to "make a

reasonable inquiry to determine whether pleadings or other documents they sign are well-

grounded in fact and warranted by existing law." *Insurance Ben. Admin., Inc.,* 871 F.2d at 1357.

This requirement applies to all signed documents filed in a case. *Id.* at 1361; Fed. Rules Civ. Proc.

Rule 11; *Jackson v. Law Firm of O-Hara, Ruberg, Osborne and Taylor*, 875 F.2d 1224, 1229 (6th Cir.

1989).

There are basic two grounds for Rule 11 sanctions. The first is the "frivolousness clause,"

which asks, objectively, whether the party or attorney made a reasonable inquiry into the facts

9

and the law before signing the document. *Id.* The second ground for sanctions is the "improper

purpose" clause, and its focus is whether a motion, pleading, or document was interposed to

delay, harass, or increase the costs of litigation. *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d

928, 931-32. This part of the rule is not concerned with how well-researched the facts or law are;

the paper is sanctionable if it was filed for an improper purpose. *Id.* Thus, FRCP 11 makes both

subjective and objective inquiries regarding any document an attorney signs. *Id.*

Defense counsel's original responses to Plaintiff Lopez's motions to compel and for

sanctions were designed to mislead this Court. Both Fahrbach and Lanzito filed these responses

before they knew Plaintiff's counsel had their July 26, 2011 email string. *10/7/11 Sanctions Hrg.*

*Trans.*, Ex. 20, pp. 86:7-87:2; 136:14-137:16. These responses were not well-grounded in fact and

they were filed with the improper purpose of misleading this Court. Plaintiff Lopez's original

motion to compel and motion for sanctions represented that Wallace had testified at his

deposition that "he initiated an IAD investigation into Defendant Fiorito's overtime practices

because he suspected Fiorito to be providing false information to CPD and prosecutors which

was resulting in overpayment to Fiorito and other officers." *Plaintiff Lopez's Motion to Compel,*

Docket No. 196, p. 4. As this Court is well aware, Captain Wallace testified to just that. *Wallace*

*Dep.*, Ex. 1.

In her filed response to Plaintiff Lopez's motion to compel, Fahrbach nevertheless told

this Court:

> "First, the City notes that Plaintiff has completely mischaracterized and misstated
> former Captain Wallace's deposition testimony. Wallace did not testify that he opened a
> complaint into Officer Fiorito, much less a complaint concerning Fiorito's overtime.
> (Notably, Plaintiff has failed to attach to her motion the transcript of Wallace's
> deposition testimony that "supports" his statements.)

*City's Resp. To Plaintiff Lopez's Motion To Compel,* Docket No. 211, pp. 8-9. In her response to

Plaintiff Lopez's motion for sanctions, Fahrbach also assured this Court: "[t]his City's

counsel attended Wallace's deposition and can state unequivocally that Wallace testified that he "inititated" an investigation into *another* police officer's potential abuse of court time." *City's Resp. To Plaintiff Lopez's Motion For Sanctions,* Docket. No. 209, p. 3. In his combined response to both motions, Lanzito also told this Court, "Captain Wallace testified that the confidential investigation as issue was related to other officer's alleged abuse of overtime." *Fiorito's Combined Response to Plaintiff Lopez's Motion to Compel and For Sanctions*, Docket No. 215, p. 5. Both attorneys falsely represented Wallace's deposition testimony to this Court in filed motion responses, in violation of Rule 11.

Both attorneys also mislead this Court by expressing a false indignation about being unfairly accused of attempting to conceal evidence. "Plaintiff's accusations that the City and its counsel have concealed a file, withheld a file, and covered up an investigation are without merit." *Fahrbach*, *City's Resp. Pl. Lopez Mot. For Sanctions,* Docket. 209, p. 4.

> "Defense Counsel certainly understands the ebb and flow of litigation and that Plaintiff's case appeared to take some damaging hits toward the latter part of the week of July 25. A briefing schedule was entered on the motion regarding the attorney notes, Plaintiff's wife was deposed, and Attorney Hamilton retrieved the approximate 750 pages of document production related to the City's July 15, 2011, supplemental disclosures…Those developments, however, do not warrant the filing of baseless motions attacking the integrity of Defendants' counsel or their clients."

*Id.* at pp. 6-7. Fahrbach then asks this Court to impose sanctions on Plaintiff Lopez, and suggests, ironically, that Plaintiff's counsel should be subject to Rule 11 sanctions. *Id.* at 7. In his response, Lanzito complains that "[p]laintiff has gone to great lengths to imply that there has been a cover-up by Defendants and their attorneys related to certain documents." *Lanzito*, *Fiorito's Combined Response,* Dockt. No. 215, p. 1; and "[p]laintiff's counsel has no basis for the inflammatory remarks she has made," *Id.* and "[p]laintiff's counsel is making inflammatory and baseless accusations against Officer Fiorito and his counsel." *Id.* at 5; and finally "there is no

11

basis for the imposition of sanctions" because there is no evidence "that there was any improper conduct" by Fiorito or his attorneys. *Id.* at 7.

These attorneys knew about their own emails, and their own efforts to conceal Captain Wallace's unfavorable testimony from Plaintiffs. Thus, these responses were clearly not grounded in fact, and were filed for the improper purpose of misleading this court, and in seeking sanctions against Plaintiff, Fahrbach sought to further harass Plaintiff and his counsel. Knowing what this Court knows now, these responses are sanctionable under Rule 11.

## III.    DEFENDANTS AND THEIR COUNSEL ARE SUBJECT TO SANCTIONS UNDER FRCP 37(b)(2) FOR LYING TO THIS COURT FROM THE WITNESS STAND.

In this case, both defense counsel took the witness stand in this case and brazenly lied to this Court. Where lying to the Court is involved, this Court may not need the violation of a court order to impose sanctions under FRCP 37.  In an unreported opinion, the Northern District of Illinois held that a court order was not necessary to impose sanctions under Rule 37 where the misconduct included lying to the court and "tampering with the integrity of the judicial system." *Quela v. Payco-General American Creditas, Inc.*, 2000 WL 656681 (N.D.Ill. 2000).  The court cited *U.S. v. Golden Elevator, Inc.*, 27 F.3d 301, 301 (7th Cir. 1994) and *Hal Commodity Cycles Management v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir. 1987) for the proposition that "all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable" and therefore the court could "properly consider the sanctions available under Rule 37." *Id.*  Thus, the argument is that attorneys and parties, sophisticated or not, are *always* under a general order not to lie or be dishonest.  *REP MCR Realty, L.L.C.. v. Lynch*, 363 F.Supp.2d 984, 998 (N.D.Ill. 2005) (citing *Quela*).

The words of defense counsel's emails have plain meanings.  At hearing before this Court, Fahrbach and Lanzito engaged in some pretty impressive linguistic gymnastics --twisting

12

their own words into pretzels in order to claim meanings entirely contrary to the words themselves. Defense counsel's testimony at hearing was reminiscent of Humpty Dumpty's way with words in Lewis Carroll's *Alice in Wonderland* (1865):

> "I don't know what you mean by 'glory,'" Alice said.
>
> Humpty Dumpty smiled contemptuously. "Of course you don't'—till I tell you. I meant 'there's a nice knock-down argument for you!"
>
> But 'glory' doesn't mean 'a nice knock-down argument,'" Alice objected.
>
> "When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."
>
> "The question is," said Humpty Dumpty, "which is to be the master—that's all."
>
> Alice was much too puzzled to say anything; so after a minute Humpty Dumpty began again. "They've a temper, some of them—particularly verbs; they're the proudest—adjectives you can do anything with, but not verbs—however, *I* can manage the whole lot of them! Impenetrability! That's what *I* say!"
>
> "Would you tell me please," said Alice, "what that means?"
>
> "Now you talk like a reasonable child," said Humpty Dumpty, looking very much pleased. "I meant by 'impenetrability' that we've had enough of that subject, and it would be just as well if you'd mention what you mean to do next, as I suppose you don't mean to stop here all the rest of your life."
>
> "That's a great deal to make one word mean," Alice said in a thoughtful tone.
>
> "When I make a word do a lot of work like that," said Humpty Dumpty, "I always pay it extra."

Like Humpty Dumpty, Fahrbach and Lanzito will need to pay their emailed words extra, if they are to mean what they want this Court to believe they mean. "Well, entire confidential investigation into Fiorito and Hazard on overtime is in the open now" simply does not mean: "Well, he's testifying at length about his mistaken belief that he opened CR into Hazard's overtime practices." *Fahrbach, 10/5/11, Sanctions Hrg. Trans,* Ex. 19, pp. 38:20-39:9. "What part of 'confidential' didn't Wallace understand, will never mean "if I had prepped Wallace he would not have testified about his mistaken belief he opened a non-existent investigation." *Fahrbach,*

*10/7/11 Sanctions Hrg. Trans.*, Ex. 20, p. 143:16-19. "That's okay, the investigation didn't go anywhere from what I remember," cannot fairly be construed to mean "but I thought you said there was no such investigation?," or "that's okay, because there was no such investigation." The word "investigation" does not mean the same thing as the word "complaint" or "allegation" and it also does not mean "non-existent" investigation. *Fahrbach, 10/5/11 Sanctions Hrg. Trans.,* Ex. 19, pp. 156:24-157:5. "Good" and "irrelevant" are two different words with very different meanings. *Fahrbach, 10/7/11 Sanctions Hrg. Trans.,* Ex. 20, pp.161:10-165:15.

The two people writing the words they did in those emails are lawyers- wordsmiths, so to speak- people who live *by their words.* Both of them make a living by carefully choosing the right words to convey an intended meaning. When they thought no one was looking, defense counsel's words were clear and understandable – and provide evidence of a conspiracy to conceal evidence. Under the bright lights of a courtroom, and while sitting in the hot seat of the witness stand, defense counsel have endeavored to mislead this Court by means of linguistic gymnastics. But this Court's own questioning indicates it was not fooled: (To Fahrbach) "So here's what I just heard you say, that when you wrote this email you actually meant exactly the opposite of the text of the email. That's what you've kind of just said, which I got to tell you, its really kind of hard to swallow." *This Court*, *10/7/11 Sanctions Hrg. Trans.*, Ex. 20, p. 104:17-21. (To Lanzito) "you've basically given me version one. Then there was version two. Then there was version 2A. And now we're back to version one. …So now---so now I got four versions of the conversation…" *This Court, 10/7/11 Sanctions Hrg. Trans.,* Ex. 20, pp. 140:14-141:19. Defense counsel's testimony to this Court was beyond, well beyond, belief.

Finally, Fahrbach blatantly lied to this Court during the evidentiary hearing when she to testified that Wallace at his deposition "did not say anything about Fiorito's overtime practices." *Fahrbach, 10/7/11 Sanctions Hrg. Trans.*, Ex. 20, p. 61:17-21. This testimony was not on account of

14

a faulty memory, either. Fahrbach not only was present at Wallace's deposition, she represented him at it, and she reviewed his deposition transcript prior to the evidentiary hearing. *Id.* at pp. 61:22-62:3; 103:1-4. This Court has reviewed Wallace's deposition and is aware that Wallace repeatedly testified about Fiorito's overtime practices. *Wallace Dep.*, Ex. 1. Defense counsel's lies to this Court are absolutely unacceptable, are an embarrassment to the legal profession, and warrant harsh and swift treatment by this Court.

## IV. DEFENDANTS AND THEIR COUNSEL ARE SUBJECT TO SANCTIONS PURSUANT TO THIS COURT'S INHERENT AUTHORITY TO IMPOSE SANCTIONS TO ACHIEVE THE ORDERLY DISPOSITION OF ITS CASES.

Federal courts have the inherent power to sanction any conduct that abuses the judicial process. *Barnhill v. U.S.*, 11 F.3d 1360, 1367 (7th Cir. 1993). This power stems from the "control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962). Thus, a court need not conform strictly to a rule or statute to issue sanctions, and it has the inherent authority to police itself without resorting to contempt proceedings. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 46 (1991).

The Court in *Chambers* cautioned that "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Id.* at 50. However, if the conduct is not adequately reached by the rules, "the court may safely rely on its inherent power." *Id.* The court may do this without even referencing any other rule or statute, but most courts combine the justifications found in the rules and statutes with inherent authority to impose sanctions for generally bad behavior. See *Quela*, 2000 WL 656681; *REP MCR Realty, L.L.C.,* 363 F.Supp.2d at 998. Under its inherent authority, this Court may award reasonable attorneys' fees when a party has acted "in

bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers* at 46 (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975).

For the reasons already outlined in previous sections of this brief, if this Court finds that defense counsel's misconduct in this case "is not adequately reached by the rules," it can safely rely upon "its inherent authority to impose sanctions for generally bad behavior." This Court should also employ its inherent authority to sanction the Defendants themselves.

**A. The City of Chicago Engages In Practices Which Abuse The Judicial Process And Prevent The Orderly Disposition Of Cases.**

This case provides this Court with an illustrative example of the elaborate system of concealment employed by the Chicago Police Department and the City in an effort to make it nearly impossible for outsiders to obtain accurate or complete information about an officer's complaint history. During this case, Plaintiff's counsel and this Court, were time and again frustrated by several troubling practices which contribute to the intentional confusion caused by the Department and the City attorneys and their manner of storing, naming, renaming, overlooking and hiding Officer Fiorito's complaint files. Plaintiffs' counsel submits that these practices are part of the City's deliberate efforts to conceal relevant and discoverable evidence, and thus outlines them here for this Court.

**1. CPD's Practice Of Producing Incomplete or Inaccurate Officer Complaint Histories**

According to counsel for Defendant City, Plaintiff's counsel now has a complete "CR history" for Officer Fiorito from January 1, 2000 to August 15, 2011.[3] It is from these "CR histories" that defense counsel (and Plaintiffs' counsel) seek and obtain complaint files during the

---

[3] Defendant City has now produced three CR histories. One was produced in March of 2010 in response to Plaintiffs' original discovery responses. The other two were produced upon request by Plaintiff Lopez's counsel after the filing of the motion to compel and for sanctions. Between the three CR histories, Plaintiff now possesses a CR history that spans continuously from January 1, 2000 to August 15, 2011.

discovery process. According to these histories, Officer Fiorito has had 48 CRs since January, 2000. But Officer Fiorito has had more than 48 CRs since then, and he has had far more than 48 complaints of misconduct. In fact, the City itself produced an additional four "CRs" that don't appear anywhere on Fiorito's CR history. Thus far, Plaintiff has been able to discover at least 70 complaints of misconduct by Fiorito, and there are likely more. Defendant City and defendant police officers regularly refer Plaintiffs' counsel to an officer's CR history in response to interrogatory requests seeking a complete list of the complaints against a particular officer complaints. By design, these CR histories are deliberately inaccurate and incomplete records of an officer's complaint history.

### 2. Hiding "the Ball" By Simply Calling It Something Besides "The Ball"

It has become painstakingly clear during the litigation of this case, that CPD uses semantics to prevent the disclosure of its officers' complaint files. Several types of files which relate to allegations of misconduct by Fiorito are simply not called "CRs," and thus, did not appear on his CR histories, and were not disclosed until sanctions were on the horizon. During the litigation of Plaintiff Lopez's motion for sanctions, Plaintiff's counsel learned the hard way that requesting CR files or even "investigative files" was not enough. CPD has several names for its complaint files. *Rivera, 10/5/11 Sanctions Hrg. Trans.*, Ex. 19, pp: 76:12-77:11. For example:

"**Log Files**" – These files are apparently complaints that are never "converted" to a "formal CR." This could be because no affidavit was signed, or in the case of a preliminary confidential investigation by IAD, the individual investigator determines that there is "no substance to the complaint." *Rivera, 10/5/11 Sanctions Hrg. Trans.*, Ex. 19, pp: 71:21-72:2. Log files do not appear on a CR history.

"**SPARs**" (Summary Punishment Action Requests) - These files are non-citizen complaints and are supposed to be reserved for "less serious transgressions." *CPD Special Order*

*S08-01-05*, Ex. 12. The discretion on whether something should be handled as a SPAR or a CR is left to the individual supervisor. *Id.* According to the CPD policy, a complaint for "failure to perform any duty" can be classified as a SPAR. *Id.* Currently, SPARS are totally destroyed and expunged from every CPD database, one year after the date of initiation. *Sasso, 10/7/11, Sanctions Hrg. Trans.*, Ex. 20, p. 22:11-23:5. One year later, a SPAR cannot be found, nor will it appear on the officers' complaint history. *Id.* SPAR files to not appear on a CR history.

"**NIs**" (Non-Disciplinary Intervention Files) - These are files relating to citizen complaints of "any remark, commentary, action, or behavior" by an officer which was overly insulting, mocking, or belittling. *CPD Special Order S08-01-08*, Ex. 12. Individual IAD investigators decide which complaints will be classified as "NIs" and refer NIs to CPD's Department of Human Resources for handling. *Rivera, 10/5/11 Sanctions Hrg. Trans.*, Ex. 19, pp. 76:22-77:11; *Sasso, 10/7/11 Sanctions Hrg. Trans.*, Ex. 20, p. 36:4-11. According to Chief Rivera, racial slurs should be handled as CRs, not NIs. *Rivera, 10/5/11 Sanctions Hrg. Trans.*, Ex. 19, p. 77:12-16. Notwithstanding Chief Rivera's testimony, complaints that Officer Fiorito called arrestees "niggers," or "a spic," were, in fact, classified as NIs, not CRs, and thus, did not appear on his CR history, and were not disclosed until sanctions were threatened. *BIS File Excerpts*, Ex. 16 and 16A.

### 3. Disappearing CR files

Several CRs that appear on one CR history simply drop off or disappear from the next CR history with no explanation, including the CR file relating to Plaintiff Steven Lopez. Nine CRs from 2007 and 2008 which appear on Fiorito's July 2009 CR history simply dropped off Fiorito's 2011 CR history. Fiorito's August 2011 CR history should include all his CRs from August 2006 until August 2011. Instead, nine CRs from 2007 and 2008, simply do not appear on Fiorito's most current 2011 CR history. Police Agent Sasso offered an explanation for this occurrence during her testimony at the sanctions hearing. According to Sasso, if an affidavit is

18

not signed, a complaint will just disappear "off the person's [complaint] history." *Sasso, 10/7/11 Sanctions Hrg. Trans.*, Ex. 20, p. 23:11-20. Despite the fact that the complaint was made, record of it will disappear from the Officer's Complaint history.

### 4. "Preliminary" Investigations and CPD's Unwritten "Conversion" Policy

The only way an outsider will have any chance to discover the existence of a prior complaint against a Chicago police officer is if information about that complaint is entered into one of two CPD databases: the CLEAR and the CRMS databases. *Sasso, 10/7/11 Sanctions Hrg. Trans.*, Ex. 20, pp. 17:25-18:7; 25:2-9. The only way a complaint is entered into the system is if a "log number" is obtained through IPRA or previously, OPS. *Sasso, 10/7/11 Sanctions Hrg. Trans.*, Ex. 20, pp. 35:22-36:8. If an IAD investigator, or a CPD supervisor chooses not to call in for a "log number" for whatever reason, a civil litigant will never discover it, and it might as well never have occurred at all. *Id.* at p. 48:18-23. Moreover, there appears to be some sort of unwritten "conversion" policy whereby some sort preliminary investigation is done before an allegation is "converted" into a CR file. *Rivera, 10/5/11 Sanctions Hrg. Trans.*, Ex. 19, pp: 71:21-72:2; *Sasso, 10/7/11 Sanctions Hrg. Trans.*, Ex. 20, p. 26:7-10. Such a preliminary investigation also will not appear on an officer's CR history, and outsiders would not even know to ask for it.

### 5. The Disingenuous Claiming of The Investigatory Privilege

Defendants have abused the investigatory privilege in this case, and because this is a common practice by Defendant City, Plaintiff Lopez asks this Court to impose sanctions for it. It is clear that Defendants disingenuously persisted in their assertion of the investigative privilege with respect to the six "open" CR files disclosed in March of 2010, but not produced until this Court ordered the City to produce them in response to Plaintiff's motion to compel. Until July 15, 2011, Defendant City was still withholding all six of these files on the basis of the

19

investigatory privilege. An examination of these six withheld files reveals that all "investigation" was completed (if any was ever done at all) nearly one year before, or as of September of 2010:

> 1023317 – No investigation done – withheld as "open" until 8/3/11
>
> 1027005 – Investigation completed 2/17/10 – withheld as "open" until 7/15/11
>
> 1027640 – Investigation completed 2/17/10 – withheld as "open" until 8/3/11
>
> 1023589 –  Investigation completed 6/25/10 (SUSTAINED)–withheld as "open" until 8/11/11
>
> 1023371 – Investigation completed on 9/29/10 – withheld as "open" until 8/3/11
>
> 1024471 – Investigation completed on 9/29/10 – withheld as "open" until 7/15/11, missing attachments produced on 9/21/11

Most of these files, as is often the case, were completed by IAD, and then sat on a desk somewhere in the "command channel review" process, in some cases for a year or more. For e.g. *Sgt Hitiris Complaint File,* Sanctions Ex. 15. Counsel's continued objection to producing these files constitutes an abuse of the investigative privilege and an abuse of the discovery process. This longstanding CPD and City practice has a purpose of deliberately thwarting the discovery process in police misconduct lawsuits.  See *9/26/01 Maurer Mem. to Supt. Hillard*, Ex. 28.

### 6.  The Deliberate Use of Outdated Complaint Histories And Defense Counsel's Failure To Supplement Their Disclosures

Moreover, Defendants had an obligation to supplement their discovery responses with respect to these "open" CR files.  As was stated in open court in response to this Court's questioning, counsel for Defendant City never even inquired as to the status of these "open" investigations. They were admittedly working from a July 2009 CR history as late as July of 2011. This deliberate ignorance by counsel for Defendant City does not comport with the Rules of discovery and should not be sanctioned by this Court.  Both law firms representing Defendants in this matter are experienced, well compensated, and highly skilled organizations.  The attorneys are well aware of their discovery obligations and moreover, they have both represented the City

of Chicago and/or Chicago police officers in a multitude of civil rights lawsuits for many years.

They are aware of the Chicago police department's practices with respect to CRs and other

documents, and are thoroughly informed about how to, and how not to, obtain CPD documents.

This Court should not accept any excuse feigning ignorance.

**B. CPD Is Fully Capable Of Doing A Better Job Of Providing Accurate And Complete Information About Its Officers' Complaint Histories And Should Be Sanctioned For Their Deliberately Inadequate System.**

The production of inaccurate and incomplete "CR" histories is by design. The Chicago

Police Department is an organization with cutting edge technology.[4] CPD technology can quickly

access the criminal history of any one of the 312 million people in the United States; give the

Superintendent immediate access to any police report from his desk; or provide real time video

and manual control of the 800+ POD video cameras mounted on light poles all over the city.

Members of the police department –the insiders- can easily and quickly obtain accurate and

complete information about any CPD officer. *Rivera, 10/5/11 Sanctions Hrg. Trans.*, Ex. 19, pp:

77:21-78:21. From the computer at his desk, the Chief of IAD, can easily and quickly obtain

information about every CR, NI, SPAR, and Log File for any Chicago police officers. *Id.*

Instead of using available resources to provide accurate and complete information, the

City of Chicago routinely and unfairly shifts its burden of disclosure to plaintiffs, thus abusing the

discovery process, delaying litigation, and needlessly multiplying the proceedings. This further

abuse of discovery is also sanctionable, and this Court may use Rule 37 as well as its inherent

---

[4] Chicago Police Department, *Technology Update* (Summer 2007) *available at* https://portal.chicagopolice.org/portal/page/portal/ClearPath/News/Department%20Publications (discussing, among other topics, the Department's receipt of national recognition for its CLEAR Data Warehouse and the Department's advanced Mobile Technology Resources).

News Report, *Chicago Police Using Predictive Analytics to Fight Crime, Police Chief Says,* GOVERNMENT TECHNOLOGY (August 9, 2010), http://www.govtech.com/public-safety/Chicago-Using-Predictive-Analytics-to-Fight.html (talking about the Department's plan to use predictive analysis to predict crime hot spots).

authority to do so. *Societe International Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 206-07 (1958).

It is well-established that the producing party cannot shift its burden of production regardless of how ominous, unorganized, archaic, or inadequate its filing system is if that system is of its own making. See *Kozlowski v. Sears, Roebuck & Co.,* 73 F.R.D. 73, 76 (D. Mass. 1976) ("To allow a defendant whose business generates massive records to frustrate discovery by creating an inadequate filing system . . . would defeat the purposes of the discovery rules."); *Alliance to End Repression v. Rochford*, 75 F.R.D. 441, 447 (N.D.Ill. 1977)(quoting *Kozlowski* and rejecting defendant's objection to plaintiff's discovery requests); *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 351, 362 (N.D.Ill. 2005)(same). Thus, the producing party bears the burden of searching its own files under whatever system it constructs, even if that system is storing unorganized documents in 350 boxes in a warehouse. *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. at 362. Finally, where the producing party fails to produce and its failure "is due basically to an indexing system of its own devising, so maintained as to obstruct full discovery," sanctions are appropriate. *Kozlowski*, 73 F.R.D. at 77.

Here, the City has clearly created a filing and retrieval system that is nearly impossible for litigants such as Plaintiff Lopez and Dean to navigate. The City deliberately uses distinct labels to confuse and frustrate plaintiffs, designates files as "open" in order to avoid discovery, and employs personnel to respond to discovery requests who do not have full access to the City's files. The effect of this self-created system is to shift the burden of production to plaintiffs, who must jump through hoops to get all of an officer's disciplinary history through several different departments and must make requests for similar documents all bearing different labels, which can just be re-labeled next month. The City is in a much better position to respond to discovery requests because only the City knows its confusing system, yet it forces plaintiffs to attempt to

figure out what precise label a file has, what designation it has, and who amongst dozens of personnel actually has access to it. The City then demands a precise formal request be made, and it deliberately withholds similar, clearly relevant documents merely because plaintiffs were not able to discern what to ask for. This is an abuse of the discovery process and is a deliberate attempt to harass plaintiffs and delay pending litigation. For these reasons, Plaintiffs in this case ask this Court to sanction the City of Chicago.

**C. Defendant Fiorito Has Also Abused The Judicial Process By Lying Under Oath About His Own Complaint History.**

As best as Plaintiff Lopez's counsel can tell to date, Defendant Fiorito has nearly 100 complaints of misconduct against him as a Chicago Police Officer, including four sustained "CRs" and at least 15 sustained SPARS. See *CR Histories, SPAR Summaries, and Sustained Findings*, Ex. 15B. At his deposition, Defendant Fiorito was asked about his complaint history and provided false and misleading responses, and this Court should employ its inherent authority to sanction him personally for his abuse of the judicial process.

First, Fiorito testified he had never had a sustained CR in his career as a police officer. *Fiorito Dep. Excerpts*, Ex. 29, p. 245:2-4. When questioned further, Officer Fiorito changed his testimony and admitted to having one sustained CR. *Fiorito Dep. Excerpts*, Ex. 29, p. 245:2-19. In reality, Fiorito has four sustained CRs, two of which the City is claiming are still "open." See *Officer Fiorito Sustained CR Excerpts*, Ex. 15A.

Second, when asked how many CRs he has had during his career, Officer Fiorito testified that he was only aware of how many he has had in the past five years, and that number was 13. Though the City's system makes it nearly impossible to determine exactly how many complaints of misconduct Officer Fiorito has had since 2000, as best as Plaintiff's counsel has been able to determine thus far, the number is more likely 10 times the number Fiorito gave under oath at

deposition. See *CR Histories, SPAR Summaries, and Sustained Findings*, Ex. 15B. Officer Fiorito's disingenuous testimony at deposition should not be taken lightly by this Court, it constitutes an abuse of the judicial process and he should be sanctioned for it.

## CONCLUSION AND RELIEF SOUGHT

The practices of the Chicago Police Department and the City of Chicago in responding to discovery in police misconduct cases is obstructionist, contrary to the law, and is the cause of unnecessary and time-consuming litigation in every courtroom in this courthouse. Defendant City's practice of abusing the investigatory privilege and withholding internal investigative files has been demonstrated in this case. What makes this case different and worthy of special attention by this Court, is the email between counsel that provides this Court with evidence that these practices are not the result of mere confusion, or an overly burdened records' department staff. The email evidences bad faith and a conscious attempt to conceal evidence. The Plaintiff's bar is not likely to receive a similar opportunity to prove and address what is a widespread problem that forces unnecessary litigation. Plaintiffs Lopez and Dean respectfully asks this Court to sanction the conduct of the Defendants and their counsel in this case by awarding the following relief:

1.  A default judgment in favor of Plaintiffs and a damages hearing to determine the amount to be awarded to each Plaintiff;

2.  Monetary sanctions in the form of reasonable attorneys' fees to be determined by this Court for unnecessary litigation caused by Defendants' conduct in this case;

3.  The opportunity to reinstate the claims of any former Plaintiff who has a viable claim and who would have chosen to proceed if he/she had known about the evidence withheld by Defendant City in this case;

24

4.   Permission to inform the jury of Defendants' deliberate attempts to conceal evidence during discovery in this case, including an adverse inference instruction concerning the missing Wallace file.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court impose discovery sanctions against Defendants and their counsel.

Respectfully Submitted,

/s Torreya L. Hamilton
Attorney for Plaintiff Lopez
HAMILTON LAW OFFICE, LLC
11 South LaSalle Street, Suite 1000
Chicago, IL 60603
312.726.3173
Attorney No. 6229397
Email: tlh@thehamiltonlawoffice.com

/s/ Christopher L. Petrarca
Attorney for Plaintiff Dean
Sraga Hauser, LLC
2215 York Road, Suite 504
Oak Brook, IL 60523-2392
(630) 928-1200
Attorney No. 6225840
Email: cpetrarca@sragahauser.com