IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES DEAN, JR., et al.,           )
                                   )
                  Plaintiffs,      )   Docket No. 09 C 1190
                                   )
            vs.                    )
                                   )
CITY OF CHICAGO, et al.,           )   Chicago, Illinois
                                   )   August 15, 2012
                  Defendants.      )   4:00 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiff:     SRAGA HAUSER, LLC
                       BY:  MS. JANE E. LI
                            MR. CHRISTOPHER L. PETRARCA
                       19730 Governors Highway
                       Suite 10
                       Flossmoor, Illinois  60422

                       HAMILTON LAW OFFICE
                       BY:  MS. TORRI L. HAMILTON
                       11 South LaSalle Street
                       Suite 1000
                       Chicago, Illinois   60603

                       ERICKSON & OPPENHEIMER, LTD.
                       BY:  MR. JON F. ERICKSON
                       118 South Clinton Street
                       Suite 200
                       Chicago, Illinois   60661

| | |
|---|---|
| 1 | For the Defendant: DYKEMA, GOSSETT, ROOKS, PITTS, PLLC |
| 2 | BY: MR. DANIEL M. NOLAND |
| | 10 South Wacker Drive |
| 3 | Suite 2300 |
| | Chicago, Illinois 60606 |
| 4 | |
| | QUERREY & HARROW, LTD. |
| 5 | BY: MR. LAWRENCE S. KOWALCZYK |
| | MS. STACEY M. ATKINS |
| 6 | MS. GHAZAL SHARIFI |
| | 175 West Jackson Boulevard |
| 7 | Suite 1600 |
| | Chicago, Illinois 60604 |

LAURA M. BRENNAN - Official Court Reporter
219 South Dearborn Street - Room 2102
Chicago, Illinois 60604
(312) 435-5785

1     (The following proceedings were had in open court:)

2         THE CLERK:  09 C 1990, Dean v. City.

3         MS. HAMILTON:  Good morning, your Honor; Torri

4     Hamilton on behalf of plaintiff.

5         MR. PETRARCA:  Good morning, your Honor; Chris

6     Petrarca, also on behalf of Mr. Dean.

7         MS. HAMILTON:  Good afternoon.

8         MR. ERICKSON:  Good afternoon; Jon Erickson

9     on behalf of plaintiff.

10        MS. LI:  Good afternoon, your Honor; Jane Li on

11    behalf of plaintiff.

12        MR. KOWALCZYK:  Good afternoon, your Honor; Larry

13    Kowalczyk on behalf of Officer Fiorito, here with Stacey

14    Atkins and Ghazal Sharifi from our office.

15        MR. NOLAND:  Good afternoon, your Honor; Dan Noland

16    for the City.

17        THE COURT:  I'm sorry.  I didn't catch the other

18    person's name.  You're Stacey Atkins.

19        MS. ATKINS:  I am.

20        THE COURT:  I didn't catch your name.

21        MS. SHARIFI:  Ghazal Sharifi, your Honor.

22        THE COURT:  Okay.  You should spell that.

23        MS. SHARIFI:  Sure.  The last name is S, as in Sam,

24    h-a-r-i-f, as in Frank, i.  First name is Ghazal, G-h-a-z, as

25    in zebra, a-l.

1     THE COURT:  All right.  So why don't we deal with Mr.
2  Noland's issue first.

3     So if I'm understanding this correctly, and you'll
4  correct me if I'm wrong, I may be doing this a bit too much
5  forest and not enough trees.  The City's position -- Mr.
6  Noland being the lawyer for the City -- the City's position is
7  that the Monell claim has been severed for trial.  The other
8  claim against the City is an indemnification claim under 745
9  ILCS 10/9102, and there is no real good reason to have that
10 being part of the trial.

11    MR. NOLAND:  That's our position.  There is, I think,
12 a vicarious liability assertion.

13    THE COURT:  On the state law claim.

14    MR. NOLAND:  Yes.

15    THE COURT:  Yes, okay.  And the plaintiffs' position
16 is we're not dropping the indemnification claim or the
17 respondeat claim.

18    MS. HAMILTON:  Correct, Judge.

19    THE COURT:  So you tell me what the authority is for
20 me to tell them they have to drop it.

21    MR. NOLAND:  Judge, we have been involved in three
22 cases where the stipulation has been accepted.  One case was
23 Jimenez before your Honor.

24    THE COURT:  That was a whole different story.  I
25 mean, it really was.  It was a whole different story, and it

1　was -- I mean, the plaintiff agreed to it in that situation.

2　　　　　MR. NOLAND:  Yes.

3　　　　　THE COURT:  Yes.

4　　　　　MR. NOLAND:  The other two we were involved in were

5　Evans and Thompsen which were similar situations to Jimenez.

6　　　　　And ultimately there is no direct claim against the

7　City.  The jury is not going to be deciding anything against

8　the City.  It is -- as a result, the City would only be in

9　there as a potential deep pocket.

10　　　　　By operation of stipulation, depending on the

11　verdict, there will be a judgment entered by your Honor either

12　for or against the City.  By operation of law, under the

13　indemnity statute as well as the vicarious liability

14　principles, there is going to be the judgment entered against

15　the City.  We're not saying we're dismissed from the case.

16　The City will be -- either way there's going to be a judgment

17　either for or against based on what the jury finds as to

18　Officer Fiorito.  So, therefore, the only --

19　　　　　There is no issue for the jury to decide as to the

20　City.  We're just an entity there.  Officer Fiorito is there.

21　The jury will know that he was a Chicago police officer.  We

22　think that there being no issue for the jury to decide against

23　the City, that the City should not be on the verdict form or

24　mentioned at trial.  The plaintiffs previously didn't quarrel

25　with this proposition.

1      THE COURT:  When you say they didn't quarrel with it,
2   what exactly do you mean by that?
3      MR. NOLAND:  Well, in addition to accepting the
4   stipulation or the bifurcation, just a couple weeks ago when I
5   initially made this point to the plaintiffs' counsel, they
6   simply said, thanks for your response.
7      THE COURT:  Well, it doesn't mean they didn't object.
8   I mean, it just means they -- it sounds kind of like what we
9   were told was I hear what you're saying.
10      MR. NOLAND:  I would have expected at that time they
11   would have said, you know, Dan, we disagree with you.  We
12   expect you're going to be sitting at counsel table or the City
13   is going to be involved.
14      So just fundamentally, Judge, there is no claim, I
15   think, perhaps under Rule 403.
16      THE COURT:  To be clear about that, there's a claim.
17   You have stipulated to liability on it, but there is a claim.
18      MR. NOLAND:  You're right.
19      THE COURT:  In fact, there's two.
20      MR. NOLAND:  True enough.  There is nothing for the
21   jury to decide against the City I think is the point I'm
22   trying to make.
23      THE COURT:  Okay.  What would you like to tell me
24   about this?
25      MS. HAMILTON:  Just, Judge, that the City is, in

1    fact, the defendant, and there are Illinois pattern jury

2    instructions that instruct the jury as to the state law claim

3    about principal and agency, and we have submitted a form of

4    that instruction that your Honor had given in a previous case

5    that I tried before your Honor, and I just don't feel that

6    there's -- I don't see the reason why we would keep that

7    hidden from the jury. There is just no legal authority to

8    keep the fact that the City is a defendant, which they are,

9    from the jury.

10            THE COURT: Yes. I mean, frankly, I'm not prepared

11   to accept the proposition that there's either a legal basis

12   or, even if there is a legal basis, a good reason to force

13   somebody to accept a stipulation.

14            So it would kind of be like -- you know, when we were

15   talking about to some extent state law claims, it would be

16   kind of like if you have an auto accident claim against a

17   truck driver who is driving a truck for a company and the

18   company comes in -- and you sue, as you always do, the truck

19   driver and the company, or as you almost always do, the truck

20   driver and the company. And the company comes in and says, we

21   stipulate and, therefore, you should drop us from the case,

22   Judge. I mean, I just -- I think that is not the predominant

23   practice, and I'm not going to force it on somebody against

24   their will. So there's your answer.

25            So I want to start off with the defense motions in

1  limine.

2          And, by the way, as I was going back through the

3  opinion, there were a handful of typo type things that I'm

4  probably going to fix in a day or two which I missed the first

5  time around, the opinion on summary judgment, in other words.

6          So on the defense motions in limine, I think the --

7          MS. HAMILTON:  Do you want us at the table or do you

8  want us up here?

9          THE COURT:  Well, if somebody is going to be talking,

10 I want you up here, but you don't all have to be standing up

11 here all the time.  That's my answer.

12         MS. HAMILTON:  All right.

13         THE COURT:  Okay.  So the first defense motion in

14 limine is to bar a reference to mental incapacity or illness.

15 And the plaintiffs' response to that is they're not going to

16 offer any testimony, and they don't have a problem with

17 precluding any mention of any diagnosis of a mental illness or

18 disability but do object to Mr. Dean being barred from

19 testifying about the state of his mental health and whatever

20 symptoms he claims to have.

21         So tell me the position on that on the defense side.

22 That would be you.

23         MS. ATKINS:  Yes, your Honor, I was just getting my

24 stuff in order.  I apologize.

25         On the defense end, we would --

1    THE COURT:  In other words, he's not going to be able

2  to get up on the stand and say, I have PTSD.

3    MS. ATKINS:  Exactly.

4    THE COURT:  Or that I've been diagnosed that I have

5  PTSD, but the plaintiffs want to be able -- the plaintiffs'

6  lawyers want to be able to say, you know, what are your

7  symptoms.  I have sleepless nights, I'm depressed, I'm that

8  kind of thing.

9    MS. ATKINS:  Your Honor, of course we have -- we have

10  no problem with him discussing on the stand that he has

11  sleepless nights and stomach aches, et cetera, but he did

12  testify in his deposition, I need not be diagnosed with PTSD

13  to have it.  And he proffered his own opinion that he had

14  PTSD.

15    And then also our concern arose from the plaintiffs'

16  offered venire questions number 1 and 2 that talked about --

17    THE COURT:  I will deal with that later.

18    MS. ATKINS:  Okay.  But we have no problem with him

19  talking about his experiences, what he's experiencing, but we

20  certainly don't want to allow him to be to able self-diagnose

21  in the absence of any medical practitioner.

22    THE COURT:  So it sounds like both sides, at least

23  the people who are here in the room right now, which does not

24  include Mr. Dean, are all on the same page on this one.  Does

25  that sound right?

1    MS. HAMILTON:  Yes, Judge.

2    THE COURT:  So here's the deal.  And, you know, it

3    doesn't matter that Mr. Dean is not here, of course, but that

4    just makes it doubly incumbent on the plaintiffs' attorneys to

5    carefully instruct him regarding what is in bounds and what is

6    out of bounds either on this topic or on any other topics I

7    have to deal with.

8    And please include in your discussion that what is

9    going to happen if he goes out of bounds is that objections

10   are going to get sustained, testimony is going to get

11   stricken, he's going to be instructed in the presence of the

12   jury to confine his testimony to the rules as I've set them,

13   as they exist under the law.  And the progressive discipline,

14   if you will, goes up from there.

15   So you will do that, right?

16   MS. HAMILTON:  Absolutely, Judge.

17   THE COURT:  So I think that what's been discussed --

18   so motion in limine number 1 is granted in part, denied in

19   part.  No testimony about diagnosis.  It's okay for him to

20   testify about symptoms.

21   Item number two, this has to do with other lawsuits,

22   incidents, et cetera, regarding Mr. Fiorito.  And so I want to

23   get a handle -- because I don't think I really got it at least

24   as well as I need it from the response.  What exactly is it

25   that the plaintiff proposes to offer relating to other

1    incidents regarding Mr. Fiorito?

2          MS. HAMILTON:  Okay, Judge, there are several, the

3    first being --

4          The first that comes to mind for me would be the

5    sustained CR for putting false information in police reports.

6    That I think comes in under 608(b).  We think it's fair game

7    for us to ask him about it.  It was a CR investigation that

8    was conducted.

9          THE COURT:  Okay.  I'm just looking for the laundry

10   list at this point.

11         MS. HAMILTON:  Then we have some 404(b) witnesses

12   that we have put on our witness list that the defendants have

13   objected to that I'm sure that we're going to have to go

14   through.  So under -- so there's those witnesses and their

15   testimony about Officer Fiorito's arrest of them.

16         And then further, we do intend to ask the state's

17   attorney -- one of the state's attorney -- former state's

18   attorney witnesses that we have on our witness list about the

19   134 cases that were dismissed -- not about each case, but the

20   fact that there was 134 DUI cases brought and put into the

21   system by Officer Fiorito that were then dismissed.  And it is

22   our position, and I can give you the argument on why we think

23   it's admissible under 404(b), if you're ready for that now,

24   but that's the list.

25         THE COURT:  Okay.  So let's talk about that last

1    thing first.  Give me the theory as to its admissibility.

2              MS. HAMILTON:  Yes, okay.

3              So, Judge, we believe that -- so this evidence, the

4    404(b) evidence, we're seeking to introduce doesn't have to do

5    with Officer Fiorito's character.  It has to do -- it has been

6    the plaintiffs' position from the beginning on this case and

7    from the original complaint that's ever been filed that

8    Officer Fiorito had a scheme, a common pattern, of the way

9    that he behaved, and the motive of which, which is another

10   reason why we would bring this in to show motive, was greed.

11             He became a police officer at age 50.  He only had

12   either 12 or 13 years to accumulate a pension or to save

13   enough money in order to retire.  And during that time, he

14   made -- for several years he was engaging in this pattern of

15   false DUI arrests, arresting people when he did not have

16   probable cause to arrest them for DUI in order to both -- for

17   motive for both greed, and also we believe his hatred of

18   minorities, people that had a sexual preference that was

19   different than his own.

20             So we think that there's a couple of different, both

21   motive and common scheme and design.

22             THE COURT:  So how does the dismissal of the

23   134 cases, or whatever it was, relate to that?

24             MS. HAMILTON:  I think that it tends to show that he

25   did not -- that he had multiple arrests, multiple cases that

1  he put in, that were dismissed because the state's attorney

2  wasn't going to proceed on them.  I think it tends to show --

3  all this tends to show lack of probable cause.

4  So what we have to prove is we have to show that he

5  did not have probable cause to arrest and he did not have

6  probable cause to prosecute or to cause Mr. Dean to be

7  prosecuted.  If he was engaged in this common plan based on

8  his motives of greed and his hatred towards black people,

9  Hispanic people and gay people, then that tends to show that

10  he didn't have probable cause, that he was --

11  So it goes towards the probable cause analysis.

12  That's our belief.  It's not being shown as improper character

13  evidence against Officer Fiorito.

14  THE COURT:  Okay, I understand your reasoning on that

15  one.

16  So on item number one, which was the sustained CR,

17  give me a little bit more detail about your take on what the

18  sustained CR involved.

19  MS. HAMILTON:  The sustained CR involved a Sergeant

20  Hitaris who responded to the scene where --

21  THE COURT:  A sergeant named Harris, you said?

22  MS. HAMILTON:  Hitaris.

23  THE COURT:  Hitaris, okay.

24  MS. HAMILTON:  Hitaris, who responded to the scene of

25  a DUI arrest that Officer Fiorito was making, had some

1    observations about the arrest, and then took a couple of days

2    off work, and when he returned and he reviewed the arrest

3    report that Officer Fiorito had created as a result of that

4    DUI arrest, he found things in the report that were false.

5    And he initiated a CR based on that, which was ultimately

6    sustained by the police department.

7            THE COURT:  I know the police department has various

8    ways of characterizing things.  What was the charge that was

9    sustained?

10           MS. HAMILTON:  I would have to get that for you, but

11   I believe it was false information in a police report.

12       (Brief interruption.)

13           THE COURT:  In terms of item number two, which was

14   what you referred to as the 404(b) witnesses, how many other

15   incidents are we talking about?

16           MS. HAMILTON:  Three, one of them being Mr. Lopez.

17           THE COURT:  Lopez, and what are the other two?

18           MS. HAMILTON:  Bonnie Klein, and Kevin Pipkens.

19           THE COURT:  Pickens?

20           MS. HAMILTON:  P-i-p-k-e-n-s.

21           THE COURT:  Pipkens, okay.

22           MS. HAMILTON:  Yes.

23           THE COURT:  And give me the thumbnail sketch version

24   of Lopez, Klein and Pipkens.

25           MS. HAMILTON:  Of Lopez?

1           THE COURT:  Of what happened in each one of those

2    situations, at least as you believe the evidence would play

3    out.

4           MS. HAMILTON:  Yes.  Well, the similarities between

5    them, they're all DUI arrests.  They're all -- the reports, if

6    you look at all the reports, you know, strikingly similar

7    allegations by Officer Fiorito.

8           THE COURT:  When you say "strikingly similar," what

9    is strikingly similar?

10          MS. HAMILTON:  They have to escorted because they're

11   falling down.  They fall out of their car.  They have to --

12   they can't -- they have to lean back in their car to avoid

13   falling down, said that about Pipkens, said the same exact

14   thing about Steven Lopez in his deposition.

15          THE COURT:  And does the report on Mr. Dean say

16   something similar to that?

17          MS. HAMILTON:  Mr. Dean says -- or he says about

18   Mr. Dean that he had to be escorted because he tripped walking

19   up the stairs into the interview area.

20          They all talk about how -- all the reports talk about

21   how the individual arrestees were all insulting, and all the

22   arrestees all say that Officer Fiorito was actually the one

23   that was swearing at them and using -- Bonnie Klein says he

24   called her a dyke.

25          James Dean says that he asked him, I think you

1  already know -- he referred to him with the term "nigger," and

2  he told Steven Lopez to "shut the fuck up."  Excuse my

3  language.  And he used derogatory terms about Mr. Pipkens'

4  sexual preferences to Mr. Pipkens.

5  So we think that there's enough similarity between

6  all of them.  They're all close in time, within a couple of

7  years at the outset, of Mr. Dean's arrest.

8  THE COURT:  Okay.  Ms. Atkins.

9  MS. ATKINS:  Where would you like me begin, your

10  Honor?

11  THE COURT:  I think go through them in the same

12  sequence that I talked about them with Ms. Hamilton.

13  MS. ATKINS:  So beginning with the 144 cases that

14  were dismissed, your Honor, counsel says that this is going to

15  show something toward a conspiracy on the part of Officer

16  Fiorito, this grand scheme that he had.

17  Your Honor, there are only two counts in this case

18  against Mr. Fiorito.  There isn't a claim for conspiracy.  As

19  to any allegations as to a sexual orientation animus motive on

20  the part of Officer Fiorito, Mr. Dean himself in his

21  deposition said that that was never a claim.

22  THE COURT:  So I've got to disabuse you of that.  I

23  mean, I guess I hear pretty frequently in employment

24  discrimination cases that, well, the plaintiff said in his

25  deposition, I can't say that this person is a racist.

1  Evidence doesn't all have to come from the plaintiff.

2       MS. ATKINS:  I understand that, your Honor.

3       THE COURT:  And so if there is -- if there is some

4  other evidence in the case whether the plaintiff, you know, is

5  aware of it or not, and the other evidence is legitimately

6  admissible, that shows that a particular motive or reason for

7  acting or whatever, the fact that the plaintiff might not have

8  known about it I think is kind of beside the point.

9       MS. ATKINS:  Well, your Honor, it's the state's

10  attorney's decision to dismiss these 144 cases.  If there's

11  transcripts or other evidence indicating that the sole basis

12  for those dismissals was because of Officer Fiorito's greed,

13  scheme, conspiracy, animus towards specific racial or sexual

14  groups, I don't know how they would aid in showing anything

15  toward the probable cause for the arrest of James Dean.

16       THE COURT:  Well, there's a claim for punitive

17  damages here, too, right, and there's a claim for malicious

18  prosecution, and so on both of those things, the person's --

19  the defendant's state of mind is more an issue than it would

20  be on a probable cause thing.  On the probable cause, it's,

21  you know, largely a question of what was the information he or

22  she had.

23       Let me ask you this.  Were these cases all dismissed

24  en masse or were they dismissed one at a time, or how did it

25  happen?

1          MS. HAMILTON:  En masse.

2          THE COURT:  And not that this is a controlling

3    factor.

4          MS. HAMILTON:  I'm sorry, Judge.  I need to correct

5    that.

6          MS. ATKINS:  You have been misinformed.

7          MS. HAMILTON:  If I could just have a second.

8          MR. ERICKSON:  The answer is not really yes.  The

9    decision to dismiss all of --

10         THE COURT:  You know what, since I'm guessing that

11   since you were not an assistant state's attorney at the time,

12   you can't tell me from personal knowledge what the decision

13   was or why the decision was.  I'm just asking, were they all

14   dismissed en masse?

15         MR. ERICKSON:  That's what I was answering.

16         THE COURT:  Let's get to it more directly because

17   it's 4:15 in the afternoon.

18         MR. ERICKSON:  They were dismissed.  The decision to

19   dismiss all of his DUIs was made at once.

20         THE COURT:  At one time.  And they got dismissed over

21   a period.

22         MR. ERICKSON:  They were dismissed as the cases

23   appeared in court.

24         THE COURT:  Fine.  Is there anything --

25         Not that this is a controlling factor, and maybe not

1     even a significant factor -- I just want to know -- is there

2     anything of record where the prosecutor explains the

3     dismissals?  Typically there wouldn't be.  It would be --

4                MS. ATKINS:  No, I'm not aware.

5                THE COURT:  It would be motion state SOL or motion

6     state nolle pros.  That's kind of the way it's usually said.

7                MS. ATKINS:  I'm not aware of anything above and

8     beyond.

9                THE COURT:  And was the prosecutor that you're

10    talking about --

11               Is it a he or a she?

12               MS. HAMILTON:  It's a he.

13               THE COURT:  He.  Was he deposed in this case?

14               MS. HAMILTON:  He was not.

15               THE COURT:  Okay.  As you stand there right now, do

16    you have any belief as to what he would say if asked why the

17    134, as you said, or 144, as she said, cases were dismissed?

18               MS. HAMILTON:  No.  I mean --

19               THE COURT:  In a temporal sense, when did these

20    dismissals occur vis a vis the grand jury investigation that I

21    keep hearing about?  Were they around the time that it became

22    known?

23               MS. HAMILTON:  Yes.

24               THE COURT:  So isn't it likely that if we really

25    pushed this person on an answer, what they're likely to come

1    out with is we didn't think we could pursue this case because

2    the man was under a grand jury investigation, which you know

3    gosh darned well that you're never going to get in at this

4    trial?

5         MS. ATKINS:  Your Honor, he also wasn't --

6         THE COURT:  I didn't ask you a question.

7         MS. HAMILTON:  Yes, I believe that may come out.  I'm

8    not -- that may be the reason why they were ultimately

9    dismissed.

10        I do know that with respect to Mr. Dean's case, that

11   there will be evidence.  I will be able to present evidence at

12   trial that his case was dismissed because it was a bad case.

13        THE COURT:  But you're going to get to present

14   evidence about why his case was dismissed because that's part

15   of what you have to prove --

16        MS. HAMILTON:  Right.

17        THE COURT:  -- you know, on the malicious prosecution

18   claim.

19        I guess my concern about this is that I don't know

20   that the dismissal of these cases really tells anybody much of

21   anything about, you know, Mr. Fiorito's motive.  I mean, it

22   maybe gives you some sense of some third party, some

23   nonparty's, assessment of how good the cases were, but I think

24   that it's -- I think it's the type of thing that doesn't have

25   a terrifically high degree of probative value, and I think the

1   possibility of, you know -- the possibility of us getting into
2   an area that is clearly going to be out of bounds is fairly
3   significant, number one.
4           And, number two, even if that were not the case, I
5   just think we're going to get into a detour into what was
6   going on in each of those 134 or 144 cases.  So I don't think
7   that's admissible.
8           So the next item is the --
9           MS. HAMILTON:  Okay, Judge.
10          THE COURT:  -- the CR.
11          MS. ATKINS:  The CR, your Honor, the sustained
12  finding was relative to Officer Fiorito counting minutes of
13  the transport into the 20-minute required time frame, the
14  observation period.
15          Furthermore, so there was no finding that he
16  falsified any information.
17          THE COURT:  What was the finding?
18          MS. ATKINS:  The finding was sustained, and I can
19  actually read the finding to your Honor.  I just --
20          THE COURT:  This is an exhibit somewhere, right?
21          MS. ATKINS:  This is an exhibit.  This was an
22  exhibit.
23          THE COURT:  Which exhibit number?
24          MS. ATKINS:  Is it one of plaintiffs' exhibits?
25          MS. SHARIFI:  Exhibit 3 plaintiffs', response to

1    defendants.

2           THE COURT:  Exhibit 3.  I've got as Exhibit 3 part of

3    Mr. Dean's --

4           MS. HAMILTON:  Exhibit 1 to plaintiff Dean's exhibits

5    to its responses to defendant Fiorito's motions in limine.

6           THE COURT:  There it is.  I've got it right here.

7           That's right.  I couldn't make head nor tail out of

8    them.  I looked at this.  I couldn't figure it out.

9           I mean, in terms of exactly what the charge was, it

10   really didn't tell me much of anything.

11          MS. ATKINS:  Okay.  I can read you --

12          THE COURT:  Or what the finding was, rather.

13          No, I've got the document.  Tell me where to look.

14   What page do I look on?

15          MS. ATKINS:  It would be --

16          Does yours have the case docket stamp on the top,

17   your Honor?  Or it is City 9338.

18          THE COURT:  Is it page 8 of 22?

19          MS. ATKINS:  The one I have is 82 pages long.

20          THE COURT:  Okay.  There's a little number in the

21   lower right-hand corner.  What's the number in the lower

22   right-hand corner, Ms. Atkins, of what you're looking at?

23          MS. HAMILTON:  The City number, your Honor?  Is that

24   what you're asking?

25          MS. ATKINS:  You have a City number there, your

1  Honor.

2  THE COURT:  Lower right-hand corner.

3  MS. ATKINS:  City 9338.  Or if yours is the 23-page

4  one, it is --

5  THE COURT:  9338, no, I've got it.  Those numbers are

6  so small that I have to really expand them significantly.

7  9338, I'm there.  "Sustained violation of general

8  order 010303A and that the accused... purposely did not

9  complete the warning to motorists in the 20-minute observation

10  period, to wit:  The accused improperly conducted the

11  20-minute observation period during a DUI arrest by utilizing

12  the documented transport time as part of the observation

13  period."

14  That's what you are referring to?

15  MS. ATKINS:  Yes, your Honor.

16  THE COURT:  I'm asking Ms. Hamilton this question.

17  How does that constitute a finding that he falsified

18  something?

19  MS. HAMILTON:  Because he then put in his report that

20  he did complete the 20-minute.  And if you look at previous

21  pages and you look at what the actual allegations made by

22  Sergeant Hitaris were, this is I think a common thing that

23  happens a lot of times in these investigations is when they

24  actually are going to sustain it, they sustain it based on

25  perhaps the least --

1    THE COURT:  Yes, but, okay, so you're going to --

2    What you're just saying right now, do you have a

3 witness who is going to testify to that?

4    MS. HAMILTON:  Okay, yes.  No, no.

5    THE COURT:  That would be a no, right?

6    MS. HAMILTON:  I was looking to ask --

7    THE COURT:  No, no, I understand.  But you're trying

8 to tell me -- what you were about to tell me or --

9    MS. HAMILTON:  What I'm about to tell you --

10    THE COURT:  What you were getting in to tell me was

11 that, no, they always explain it in a way that makes it look

12 less damaging to the officer, okay.  Maybe that's true, maybe

13 it's not, but there is no witness who's going to testify to

14 that in this case.

15    So let's confine what we're talking about about

16 evidence that is going to come in.

17    MS. HAMILTON:  Fair enough.

18    So that was what was sustained.  The allegations as I

19 had explained them to your Honor previously, if you look at a

20 couple of pages before, if you look at page 9335, you can read

21 for yourself, you know, why Sergeant Hitaris actually

22 initiated the investigation was that he looked at the reports

23 and that it would be impossible --

24    THE COURT:  And Fiorito explained when he was

25 interviewed that he counted the travel time, or he counted the

1  travel time as part of the 20 minutes, and the finding

2  basically is you can't count that 20 minutes or you can't

3  count that time as part of the 20 minutes.  I don't see this

4  as a --

5         I mean, you know, if all of us were to sit back and

6  kind of analyze it and massage it, you might say, okay, well,

7  he was fudging the rules or he was fudging what he said.  I

8  mean, I don't think that's what the finding is.  And, you

9  know, you don't have that type of a claimed misrepresentation

10 in this case, at least that I'm aware of, on the part of

11 Fiorito.  So I'm excluding that as well.

12        I don't even think that's relevant.  And even if it

13 is, I think the possibility of confusion and the need -- all

14 of the evidence that would be needed to explain it I think far

15 outweighs the limited probative value that it has.

16        So that leaves us with what's been referred to as the

17 404(b); namely, the other incidents.  So let me hear from you

18 on that.

19        MS. ATKINS:  Your Honor, I will begin with Mr. Lopez.

20 As your Honor might be aware, Mr. Lopez was named plaintiff in

21 this matter.  His matter has been settled.

22        THE COURT:  Right.

23        MS. ATKINS:  I can't imagine that he would bring

24 anything toward the table relative to the probable cause for

25 the arrest of Mr. Dean.

1    THE COURT:  Yes, and so let me -- just to have you

2    talking about the thing that I'm interested in here, it

3    basically has to do with what I would call motive evidence and

4    possibly, if what Ms. Hamilton says is right, about

5    similarity, misrepresentations or similarity of statements,

6    possibly modus operandi evidence.  So talk about it with that

7    in mind.

8        MS. ATKINS:  Your Honor, in that respect, as you can

9    imagine, using the same descriptive terms for people who are

10   intoxicated is not unusual.  But these --

11       THE COURT:  There's only so many ways you can

12   manifest being drunk.

13       MS. ATKINS:  Absolutely.  Thick tongue --

14       THE COURT:  I don't know.  Can I take a poll of

15   everybody in the room on that one?  I'm being facetious.

16       Go ahead.  It's all right.

17       MS. ATKINS:  Your Honor, we also, relative to Mr.

18   Lopez, we have a disclosure issue with him as well.  He was

19   not disclosed as a witness for Mr. Dean.  The fact that he may

20   have been disclosed back in his own case as providing

21   testimony relative to anything relative to motive or intent of

22   Officer Fiorito, that doesn't necessarily mean that we are to

23   suppose that he is going to come in as a 404(b) witness.

24       THE COURT:  How are you harmed?  You took his

25   deposition, right?

1          MS. ATKINS:  I'm sorry?

2          THE COURT:  How are you harmed?  You took his

3     deposition, right?

4          MS. ATKINS:  Well, we did take his deposition, your

5     Honor.

6          THE COURT:  Right.  37(c)(1) talks about

7     nondisclosure.  You exclude the person unless it's

8     substantially justified or harmless.

9          So how are you harmed, by the fact that they didn't

10    put him on the list until recently?

11         MS. ATKINS:  The fact that he didn't put him on the

12    list.

13         THE COURT:  Okay.  What's your next point?

14         MS. ATKINS:  Then we have got Bonnie Klein.

15         THE COURT:  What is your next point on him because I

16    don't find that in the least bit persuasive.

17       (Brief interruption.)

18         THE COURT:  I mean, I assume you have some

19    overarching argument that relates to all three of these

20    people.

21         MS. ATKINS:  The overarching argument relative to

22    these 404(b) witnesses is that they are not substantially

23    similar.  Their experiences are not substantially similar to

24    Mr. Dean.

25         THE COURT:  So I have a pretty good handle on what

1  the scenario is that both sides have given relating to
2  Mr. Dean.

3          MS. ATKINS:  Sure.

4          THE COURT:  I have less of a scenario as it relates
5  to Mr. Lopez, Ms. Klein and Mr. Pipkens.

6          So can you give me anything about, you know, sort of
7  a thumbnail sketch of what the scenario is for those three
8  people?

9          MS. ATKINS:  Your Honor, I think the most important
10 thing here is that Mr. Dean did not take a Breathalyzer.

11         THE COURT:  Yes.

12         MS. ATKINS:  Mr. Pipkens did and blew a .19.

13         THE COURT:  The number is .08 that you have to
14 exceed?

15         MS. ATKINS:  Yes.

16         THE COURT:  He blew .19.

17         MS. ATKINS:  A .19.

18         THE COURT:  All right.

19         MS. ATKINS:  Bonnie Klein.  Mr. Dean didn't plead
20 guilty.  Ms. Klein did.

21         THE COURT:  Pled guilty?

22         MS. ATKINS:  Pled guilty to a DUI.

23         THE COURT:  Okay.

24         MS. ATKINS:  Mr. Lopez is married.  He's not a
25 homosexual.  So I don't know what they could bring into the

1  table.

2         THE COURT:  Okay, back up again.  So Pipkens blew

3  .19.

4         MS. ATKINS:  Yes.

5         THE COURT:  Klein pled guilty.

6         MS. ATKINS:  Yes.

7         THE COURT:  And so putting aside what Mr. Lopez's

8  sexual orientation is or isn't --

9         MS. ATKINS:  Sure.

10         THE COURT:  -- what are the circumstances surrounding

11  his arrest, at least as you understand them?  Lopez.

12         MR. KOWALCZYK:  I apologize.

13         THE COURT:  That's fine.  I don't care who says it.

14  Go ahead.

15         MR. KOWALCZYK:  As I understand it, Mr. Lopez was out

16  for the evening dancing with a friend, and on the way out,

17  Officer Fiorito will testify that his lights were not on.

18  There is an automatic feature on his lights which he admitted

19  to.  He claims the lights were on, was pulled over, was made

20  to do field sobriety tests.

21         THE COURT:  Okay.

22         MR. KOWALCZYK:  He did indicate that he had a leg

23  issue from a prior injury.  So an issue there was he failed

24  the test or apparently didn't do as well on the test because

25  of his Achilles tendon issue.  We did get the medical records

1    of Lopez regarding that.  It was an old injury.

2           But Officer Fiorito, I believe, testified that he

3    allowed him to use whichever leg he wanted to stand on.  I

4    think it was the standing test.  So he did go through field

5    sobriety tests, was arrested for DUI.

6           The case was later either nolled or SOL'd.  I don't

7    know the disposition exactly, but I believe it was nolled.

8           THE COURT:  Ms. Hamilton, let me ask you a couple of

9    questions about each of these other people.  So as I

10   understand it, Mr. Dean is going to testify that at some point

11   Mr. Fiorito used the N word, right?

12          MS. HAMILTON:  Yes.

13          THE COURT:  Is he going testify -- as you understand

14   it, is he going to testify at the trial -- not whether he

15   testified at the deposition -- is he going to testify at the

16   trial that Mr. Fiorito made any reference to his sexual

17   orientation?

18          MS. HAMILTON:  No.

19          THE COURT:  Is he going to testify that he had any

20   reason to believe that Mr. Fiorito was even aware of a sexual

21   orientation?

22          MS. HAMILTON:  I do not believe he is, no.

23          THE COURT:  Okay.  So I want to ask you about what

24   you referred to as swearing, and what I wrote down was

25   derogatory references with regard to each of these other

1  people.

2       What would Mr. Pipkens testify about whatever

3  swearing or derogatory references then Officer Fiorito made?

4       MS. HAMILTON:  I'm going to ask Mr. Erickson to

5  answer that one.  He knows Mr. Pipkens much better than I do.

6       MR. ERICKSON:  Directed at sexual orientation.  There

7  were words like fag and queen.

8       THE COURT:  How about Ms. Klein?

9       MS. HAMILTON:  Dyke.

10       MR. ERICKSON:  Dyke.

11       THE COURT:  Okay.  No racial reference.  I don't know

12  their race, okay.

13       What about Mr. Lopez?

14       MS. HAMILTON:  He was just swearing at Mr. Lopez,

15  telling him to -- which everybody says he did, a constant

16  thing.

17       THE COURT:  Like?

18       MS. HAMILTON:  "Shut the fuck up" and "do the fucking

19  test" and just swearing at him.

20       THE COURT:  And not to get into sort of, you know, a

21  question of how similar different swear words are, the swear

22  words that are most immediate in my memory in this case is

23  "goddamn."

24       MS. HAMILTON:  Yes.

25       THE COURT:  Okay.  Is Mr. Dean going to say that

1  Fiorito used the F word?

2         MR. ERICKSON:  I don't believe so.

3         THE COURT:  Okay.  I mean, these don't strike me as

4  similar enough to be modus operandi evidence.  I mean, nobody

5  has told me that any of these situations are situations --

6         See, what we have got in this case, as I understand

7  it, sort of from a 10,000 foot view, is Mr. Dean gets busted

8  by the other officer, goes into the station.  He takes care of

9  his business, he comes back out.  He's out by his car.  At

10  some point, Fiorito approaches the car, tells him to move the

11  goddamned car.

12         Leaving out a lot of the intermediate stuff, Mr. Dean

13  gets in the car, and he's going to testify that he pulled out

14  into the traffic, pulled into the gas station across the

15  street, did a three-point turn and went around and parked the

16  car, at which point Fiorito comes and tells him again to move

17  the goddamned car, which he does by pulling up past the next

18  street, and then Fiorito then does the, quote, unquote,

19  sobriety test and gives him a whole raft of tickets.

20         MS. HAMILTON:  Yes.

21         THE COURT:  Okay.  Is there anything on Lopez, Klein

22  or Pipkens that is at all like that in terms of how it played

23  out?

24         I mean, what I have been told on Lopez -- it was

25  either Pipkens or Lopez -- that it's like right after he comes

1  out of a bar, he gets busted, or pulled over.

2        MS. HAMILTON:  On Lopez you're talking about?

3        THE COURT:  I don't remember if it was Lopez or

4  Pipkens.

5        MS. HAMILTON:  Shortly thereafter, yes.

6        And I think one of the things that we have heard time

7  and time again and we heard from all of these witnesses that

8  we're talking about here today are that he -- that Officer

9  Fiorito, the way that he administers these field sobriety

10  tests to all these people and to everybody else is he's

11  screaming and swearing at all these people while they're

12  trying to do the test.  So that's why I'm bringing that up.

13        THE COURT:  I did not focus on that all that much as

14  it relates to Mr. Dean.

15        Is that what Mr. Dean's going to say?

16        MS. HAMILTON:  That he was yelling at him and telling

17  him and swearing at him, I believe everybody says that.

18        THE COURT:  While he was doing the field sobriety

19  test?

20        MR. ERICKSON:  Yes.

21        MS. HAMILTON:  Yes.

22        THE COURT:  You're saying that all of these other

23  people would say something similar about that, that he's

24  screaming at you while you're doing the field sobriety tests,

25  which I suppose a reasonable person could say that's a way of

1  getting you to flunk.

2       MS. HAMILTON:  Yes.

3       THE COURT:  Or it's a way of getting you to appear to

4  flunk or something like that.  I don't know.

5       MR. ERICKSON:  They're divided attention tests, and

6  so they're designed to make your brain do one thing while your

7  body is doing another, and that's a distraction, to be yelled

8  at like that.

9       THE COURT:  But are they all going to testify --

10  would all four of these people, including Mr. Dean, Lopez,

11  Pipkens, and Klein all testify that while he was doing field

12  sobriety tests, he was screaming and yelling at them?

13       MR. ERICKSON:  I believe they would all say that he

14  was belligerent, yes.

15       THE COURT:  What do you say about that?  You were

16  shaking your head, which I would appreciate it if you didn't

17  do, actually, which I would appreciate if you didn't do.

18       MS. ATKINS:  I'm sorry.  It was involuntary.

19       THE COURT:  Because that is distracting.  I have to

20  do divided attention tests all the time, and you just divided

21  my attention the same third way that these guys said that

22  Fiorito did.  I'm dead serious about this.  It's really

23  annoying, so don't do it.

24       Okay.  So now you can talk.

25       MS. ATKINS:  Again, I know from your prior comments

1    that it's not what Dean testified to at his deposition; it's

2    what he testifies to at trial.  But at his deposition, none of

3    the --

4              Well, the only derogatory term allegedly uttered by

5    Officer Fiorito took place after --

6              THE COURT:  The sobriety.

7              MS. ATKINS:  -- the tests were administered and he

8    was walking across the street to the station.

9              THE COURT:  Was Mr. Dean asked at his deposition when

10   he was doing the sobriety test, was Fiorito saying anything?

11             MS. ATKINS:  He was explaining the test to him.

12   That's what Dean testified to.

13             THE COURT:  So Mr. Dean did not testify in his

14   deposition that he was yelling at him, screaming at him,

15   anything like that?

16             MS. ATKINS:  No.  He yelled at him, allegedly yelled

17   at him through the loudspeaker to move the goddamned car.

18             THE COURT:  No, that I know.

19             MS. ATKINS:  And beyond that, he explained the test

20   to him during the administration.

21             THE COURT:  Pause.  Is she misrepresenting the

22   deposition?

23             MS. HAMILTON:  Judge, I wasn't at his deposition, but

24   Mr. Petrarca just came to me -- Mr. Petrarca just whispered in

25   my ear and said he was never asked that question.

1          MR. PETRARCA:  I believe he was never asked that

2    question.

3          MS. HAMILTON:  That's what I was --

4          MR. ERICKSON:  What Mr. Dean does say is that the

5    belligerence level escalated from the beginning and all the

6    way through, sort of culminating in the N word.

7          THE COURT:  Okay.

8          MR. ERICKSON:  Your Honor, if I may say something?

9          THE COURT:  Go ahead.

10         MR. ERICKSON:  Another similarity with all of these,

11   or at least with regard to Pipkens and Dean and Klein, is the

12   driving portion, that Officer Fiorito fabricates the probable

13   cause to make the initial stop, and then he represents in his

14   police reports and the litany of traffic citations that he

15   issues and he exaggerates the bad driving that he needs to --

16   that the state needs to prove to the Court.

17         For example, with regard to James Dean, you're

18   familiar with what James Dean's testimony was with regard to

19   the driving, and yet Officer Fiorito has him driving left of

20   center, failure to stay in the lane, stopping in the middle of

21   an intersection and blocking it for two minutes, causing, you

22   know, that kind of reckless driving.

23         With regard to Mr. Pipkens, he claims that

24   Mr. Pipkens over I believe it was a mile-and-a-half-period

25   length distance violated several traffic violations including

1    swerving in the other lane, violating traffic control devices,

2    et cetera.

3            And then with regard to Ms. Klein, she indicates

4    Mr. Pipkens had two DUIs with Officer Fiorito.  One was -- the

5    defense was that he wasn't driving at all, and I believe that

6    is what Ms. Klein says, too.

7            THE COURT:  So do you agree that Ms. Klein pled

8    guilty to DUI?

9            MR. ERICKSON:  Yes.

10           MS. HAMILTON:  Supervision, Judge.

11           THE COURT:  So you're going to say that when she

12   admitted her guilt, she wasn't telling the truth?  She's going

13   to be a great witness for you.

14           MS. HAMILTON:  Well, Judge, we actually --

15           THE COURT:  I mean, everybody in the room knows that

16   happens sometimes, okay.

17           All right.  So here is what I think I need on this.

18   I don't have enough information.

19           MS. HAMILTON:  Okay.

20           THE COURT:  I need the following, and it's going to

21   have to be real fast because the trial is starting on Monday.

22   I need to see the police reports on all three of these folks.

23   I don't think I've got those in here.  I mean, I've got

24   deposition testimony just from Dean and from Fiorito.  I need

25   -- I do not want -- please, please, please, I do not want the

1  entirety of --

2       Have any of them been deposed, all three of them or

3  just one?

4       MS. ATKINS:  Two of them.

5       THE COURT:  Lopez was deposed.

6       MR. KOWALCZYK:  Lopez was deposed.  Pipkens was

7  deposed.  And I just got the dep today.  Bonnie Klein was

8  served but never showed up.

9       THE COURT:  Oh.  Served by you but never showed up?

10      MR. KOWALCZYK:  Well, by our investigator, yes, sir.

11      THE COURT:  But she was served with a subpoena for a

12  deposition and didn't come in?

13      MR. KOWALCZYK:  Yes.

14      THE COURT:  Well, that would be another problem on

15  Ms. Klein.

16      So do you have a ball park sense of how long the

17  Lopez and the Pipkens deps are?

18      MR. KOWALCZYK:  I just got the Pipkens one today,

19  Judge.  It's like 40 pages.  I got it emailed to me.

20      MS. HAMILTON:  Judge, I can simplify this.  We'll

21  withdraw Ms. Klein as a potential witness based on our

22  conversations here today.

23      THE COURT:  So what I need are the reports on Lopez

24  and Pipkens and Mr. Dean.  I don't think I've got all of that

25  yet.  I may have it as part of the summary judgment stuff, but

1   that's long ago in the blue bin.

2              And then I need the depositions of Lopez and Pipkens.

3              MR. KOWALCZYK:  And I don't think Lopez is much

4   longer, Judge.  It may be slightly longer because he's a

5   plaintiff.

6              THE COURT:  All right.  And I need them, like, by

7   first thing in the morning, and then I will decide that later.

8              Now that we have done two motions in limine in

9   45 minutes, we're going to move on.  So give me just a second

10  here.  So item number three -- I think we'll be moving

11  quicker.  We're not going to go past 5:00, and I'm going to

12  make you come back tomorrow to finish up whatever we haven't

13  finished up yet.

14             Item number three is indemnification and sending a

15  message.  So let me just tell you basically what the ground

16  rules are on that.  Well, there's going to be, as part of the

17  jury instructions, a reference to the fact that the City is a

18  defendant on, you know, certain claims and, you know, on

19  whatever the elements of those are.  And so I'm not trying

20  to --

21             Nothing I say affects the jury instructions, and I

22  have had at least a couple other cases where I've instructed

23  on 9-102 claims.  That aside, unless the issue of finances or

24  ability to pay is injected into the case by the defendant,

25  then the plaintiff doesn't get to bring up that there's

1    indemnification.

2          And so when I say "injected into the case," there's

3    many ways that that can be injected into the case.  And I'm

4    not going to try to give a laundry list because I'm sure I

5    would leave things out.  But I'm assuming that everybody --

6    because you guys all do this for a living, that gives you

7    enough guidance so that you know what is fair game and what

8    isn't.

9          So the one addition to that is that if the plaintiff

10   thinks that something has come in that brings this into play,

11   you don't get to just mention it; you have to ask for a

12   sidebar.  Okay.

13              MS. HAMILTON:  Of course, Judge.

14              THE COURT:  All right.  As far as sending a message

15   is concerned, I mean, sending a message has to do with

16   punitive damages which are, by definition, only going to be

17   against Fiorito.  So you can argue sending a message to

18   Fiorito all you want.  You can't argue about sending a message

19   to the city of Chicago because I don't think that's an

20   appropriate argument.

21              MS. HAMILTON:  Judge, just as a point of

22   clarification, the jury instruction, I believe, allows us to

23   say sending a message to Officer Fiorito and any other

24   officers.

25              THE COURT:  And others like him, yes, others similar.

1    Whatever the lingo of the instruction is, that's fine.

2              MS. HAMILTON:  Thank you.

3              THE COURT:  Reference -- number 4 is reference to

4    settlement or disposition of other lawsuits.  That's not

5    objected to, so we don't need to talk about that.

6              Number 5 is lost wages.  Okay.  So having read what

7    both sides --

8              Let me ask you this.  What is he going to say?  What

9    do you think he's going to say as you stand there right now?

10             MS. HAMILTON:  Yes.

11             THE COURT:  Let me rephrase the question in that way.

12             MS. HAMILTON:  Mr. Dean holds a very strong belief

13   that the fact that he has brought this lawsuit has impacted

14   his ability to get certain grants and perform certain

15   contracts and that he has, therefore, lost certain

16   opportunities as a result.  And he believes he has been told

17   by --

18             THE COURT:  By whom?

19             MS. HAMILTON:  By some representative from the city

20   of Chicago that they're not going to consider, even consider

21   any of his applications if he is a litigant against the City.

22             THE COURT:  Has he ever identified --

23             But this came up in his deposition, I'm assuming,

24   right?

25             MS. ATKINS:  Yes.

1    THE COURT:  Because Mr. Dean, I'm sure, didn't
2  hesitate to tell anybody about it.
3    Did somebody ask him who's the person who told you
4  this?
5    MS. ATKINS:  They did.
6    THE COURT:  What did he say?
7    MS. ATKINS:  He didn't identify them.
8    THE COURT:  Did he say, I don't know, I don't
9  remember, or I won't tell you, or what?
10    MS. ATKINS:  No.  I believe he said:  It was a
11  representative of your client, I mean, the City.
12    THE COURT:  Okay.  And so let's assume you get past
13  the problems that are inherent in that.  What is it that he's
14  going to say that he lost?  It's not going to be that he had
15  some contract that was taken away.
16    MS. HAMILTON:  Correct.
17    THE COURT:  It's going to be, I didn't get a
18  contract.
19    MS. HAMILTON:  Yes, I believe so.  I believe -- and
20  as your Honor is well aware, it's a little difficult to answer
21  that question.
22    THE COURT:  I understand.
23    Do you want to contribute anything, Ms. Li?
24    MS. LI:  At one point Dean did tell me.  He
25  identified a person, I believe the name was Ann, who told him

1  that --

2            THE COURT:  Just the first name?

3            MS. LI:  Just the first name.

4            THE COURT:  As we would say in criminal law, Ann Lnu,

5  L-n-u, last name unknown.

6            MS. LI:  And then it was at some housing meeting, and

7  I went to the website he referred me to.  I couldn't find it.

8  I couldn't find any transcript.  I couldn't find any other

9  further information about this.

10           THE COURT:  Just as an aside, there was a criminal

11 complaint filed last week.  The actual official title of it on

12 the docket is U.S. v. Fnu Lnu, first name unknown, last name

13 unknown.  Fnu Lnu.  I'm not making it up.  You can go on the

14 recently filed cases and you will see it.  It was last week.

15           Okay.  Is there any other lost income evidence other

16 than what you have just talked about?  Are there other topics

17 of lost income?  I mean, was he making -- did he have a job

18 where he had wages where he, you know, didn't come into work,

19 he wasn't able to come into work because he had to go to court

20 or anything like that?  I mean, I remember Mr. Dean saying at

21 some point that he was in the real estate business.

22           Did he say that there was some sale that he couldn't

23 close because he had to concentrate on going to court,

24 anything like that?

25           MS. LI:  No.

1         And what complicates this, as was discussed in the
2    deposition, he was employed as a real estate broker at a firm.
3    He was terminated from that position several months before
4    this incident happened.
5         THE COURT:  Before this.
6         MS. LI:  He also had a nonprofit.
7         He was working on his own for homeless veterans is
8    what he's going to testify to.  He was unable to assist his
9    clients because of this.  He was unable to get the contracts
10   needed or get or have the ability to even see the buildings he
11   needed to see in order to submit the contracts needed.
12        THE COURT:  Because of this being that he had --
13        MS. LI:  Because of the lawsuit that he filed, this
14   lawsuit, and that's what he's going to say.
15        THE COURT:  Wait a second.  I'm not talking about
16   what he's attributing to other people having told.  I'm
17   focusing on what you just said, and it sounded like to me that
18   part of what you were just saying is that he had this
19   nonprofit and there were certain things that he couldn't do
20   because of this.
21        MS. LI:  Because of this.
22        THE COURT:  The "this" is the lawsuit.
23        MS. LI:  Correct.
24        THE COURT:  And is the "this" the fact that he had to
25   spend so much time on the lawsuit?

1     MS. LI:  On this current lawsuit, yes.

2     THE COURT:  Yes.

3     MS. LI:  Not the DUI.

4     THE COURT:  Not the DUI but the lawsuit.

5     MS. LI:  Yes.

6     THE COURT:  Okay.

7     MS. HAMILTON:  Well, it's, of course, our position

8 that this lawsuit resulted from.

9     THE COURT:  I understand, okay.

10     So let's just put that part to the side for a second

11 and just talk about the other stuff.  So the problem I have

12 with the testimony about I was, you know, basically cut out of

13 the ability to get other contracts or business with the City,

14 it strikes me that it's too speculative to be relevant that he

15 actually would have gotten those contracts.

16     It's not directly analogous, but there is a doctrine

17 in Illinois law which is oftentimes followed in federal court

18 having to do with getting lost profits for a business that's a

19 start-up.  And the general rule is -- it doesn't apply in

20 every case.  But the general rule is is that you can't get

21 lost profits for a lost business opportunity for a startup

22 because there's nothing like a track record and there's no way

23 of proving, you know, what you would have gotten.

24     This strikes me as a similar situation except more so

25 because it's not just that he would have had to have bid on

1   the contract; he then would have had to win the contract, you

2   know, get through all of the approvals, actually perform and

3   actually get money.  We don't know when any of those contracts

4   were.

5           That lost income evidence just strikes me as way too

6   speculative, so I'm excluding it under Rule 402 but really

7   more Rule 403.

8           As far as the rest of it is concerned, I guess what

9   I -- now that you have a clear sense, I think, on the defense

10  side of what you're talking about -- and let me just sort of

11  describe it in a nutshell so that we're all on the same page.

12  He's saying that because of the improper arrest and the

13  malicious prosecution, I filed this lawsuit, and because I had

14  to spend all this time on this lawsuit, I was not able to do

15  A, B, C and D.  Okay.

16          Let's cut out of it that nobody gave me a contract

17  because of the lawsuit because he can't testify about that.

18  That's what I think I just said.  What I do not know is

19  whether what I just described would be sort of within the

20  realm of what you would call proximate cause.  I just don't

21  know.  There may be law about this, so I'm going to need you

22  to try to find something for me.  And we'll talk about this

23  more at another point in time before anybody has to give an

24  opening statement.

25          Number 6.  Bar evidence regarding medical,

1    psychiatric treatment and bills, et cetera, et cetera, et

2    cetera.  And the plaintiff doesn't object to putting in

3    evidence about medical or psychiatric treatment or having

4    incurred medical bills.  And the plaintiff, you don't object

5    to that.  The part you object to is basically him being able

6    to say, I wasn't able -- I had all these symptoms, but I

7    wasn't able to go seek care because I didn't have any money.

8                MS. HAMILTON:  Correct.

9                THE COURT:  What's wrong with that?

10               MS. ATKINS:  Well, your Honor, his lack of funds

11   doesn't stem from this lawsuit.

12               THE COURT:  Yes, I understand.

13               MS. ATKINS:  As counsel just said, he lost his

14   primary source of income months before he was arrested.

15               THE COURT:  Here is the way I see this playing out.

16   It's one of two things.  He's going to get on the stand and

17   testify, I was depressed, I had sleepless nights, et cetera,

18   et cetera, et cetera.  It may be that the direct ends there

19   and then somebody gets up on cross and says:  Were you ever

20   treated by a doctor?  And you say, no.  He says, no.

21               And then the redirect is:  Why weren't you treated by

22   a doctor?  I didn't have any money.  I couldn't afford to go

23   get treated by a doctor.

24               Okay.  So that's way number one that it would come

25   up.  Let's assume that knowing that, you don't ask that

1   question on cross.  And since Ms. Hamilton knows that you're

2   not going to ask the question on cross, she says on direct,

3   did you ever seek treatment for it, because she figures, well,

4   a juror might say, wait a second, the guy says he has

5   sleepless nights.  Why didn't he ever go get treated for it?

6   And she wants to be able to explain that.

7           I think it's legitimate.  You can do it.  I think

8   it's perfectly legitimate.  You can do it.  Okay.

9           Number 7.  Reference to other encounters with Officer

10  Fiorito.  That is the White Palace Grill.  That is not

11  objected to.

12          Reference to media coverage.  So the plaintiff says

13  they don't object except to the extent it's used for

14  impeachment purposes.  And I guess, for me, that's good enough

15  for now with the caveat that if you decide you're going to

16  want to go into something for impeachment purposes, you must

17  bring it up at a sidebar first.

18          MS. HAMILTON:  Understood.

19          THE COURT:  Number 9, to bar reference to witnesses

20  not in the pretrial order.  Who exactly are we talking about?

21          So this whole thing about, if you don't have it in

22  the draft of the pretrial order, it's out, that's baloney.

23  Come on.  Seriously, it's just baloney.

24          So is there somebody who is not in the pretrial order

25  aside from Lopez, which we have talked about, that you think

1  that the plaintiff's going to call that you think wasn't

2  disclosed in some, you know, in the 26(a)(1s)?

3         MS. ATKINS:  No.

4         THE COURT:  Okay.  So I don't think we have an issue

5  to talk about that.

6         Bar any testimony or evidence regarding the Monell

7  claim.  Well, I think that's probably wrapped up with this

8  thing about other act evidence, so we'll just table that for

9  now.

10        Number 11 is bar testimony, reference or evidence of

11  other DUI officers or other police misconduct.  There is no

12  objection to that, so that one's granted.

13        Number 12 is bar any testimony, reference or evidence

14  of alleged motive based on race or sexual orientation.  Well,

15  he can say the thing about what he contends Fiorito told him,

16  the use of the N word and other words, and the testimony that

17  is referenced from his deposition in the response.

18        So the thing that I guess I have a question about is

19  the sexual orientation evidence, and it kind of goes back to

20  what I asked before.  So what I was told before when I asked

21  questions about this, in other words, earlier today, is I was

22  told that Fiorito didn't say anything about his sexual

23  orientation and that there's not -- that there's not going to

24  be any testimony that Fiorito would have even had any reason

25  to understand whatever Mr. Dean's sexual orientation is.

1          Did I catch that right?

2          MS. HAMILTON:  We don't believe that there would be

3    testimony.

4          THE COURT:  Okay.  So how is evidence about his

5    sexual -- how is evidence about sexual orientation as a motive

6    even relevant then?

7          MS. HAMILTON:  I don't think it is, Judge.  I'm

8    sorry.

9          THE COURT:  There you go, fine.  That one is granted.

10          Number 13.  Evidence of a grand jury investigation.

11    There is no objection to that, so that's granted.

12          Number 14 is the thing about the summary suspensions.

13    Okay.  So I think you are correct that the Hurlburt case,

14    H-u-r-l-b-u-r-t, just talks about collateral estoppel effect

15    or what people in a more modern way call issue preclusion.  I

16    get that.

17          So what's the basis for admissibility?  So what

18    you're talking about here is it's classic hearsay.  It's an

19    out-of-court statement by somebody saying there was no

20    probable cause, and you want to put this out-of-court

21    statement in to prove that there was no probable cause.

22          MS. HAMILTON:  Well, so my argument on this, Judge,

23    is that there is obviously a malicious prosecution claim.  And

24    my understanding of the law -- I'm sure your Honor will

25    correct me if I am wrong about this -- but malicious

1　　prosecution requires that the defendant either initiated or

2　　caused to continue judicial proceedings against the plaintiff.

3　　　　　　THE COURT:  Okay.

4　　　　　　MS. HAMILTON:  So my position and my argument to your

5　　Honor is that he actually initiated two different types of

6　　judicial proceedings.

7　　　　　　THE COURT:  Oh, so both the DUI and the summary

8　　judgment.

9　　　　　　MS. HAMILTON:  Yes, sir.

10　　　　　　Therefore, the finding on the statutory summary

11　　suspension is relevant to the malicious prosecution claim with

12　　respect to the fact that, you know, it was terminated in the

13　　plaintiff's favor.

14　　　　　　THE COURT:  In a manner consistent with innocence

15　　even.

16　　　　　　MS. HAMILTON:  Correct.

17　　　　　　THE COURT:  Interesting.  How about that?

18　　　　　　MS. ATKINS:  It's a very novel argument, your Honor.

19　　　　　　It's our position that introduction of this finding

20　　at the summary suspension hearing will do nothing but confuse

21　　the jury.  It is their job to determine whether or not the

22　　elements of malicious prosecution as they're being presented

23　　in this litigation have been met, and, you know, beyond what

24　　your Honor called classic hearsay.

25　　　　　　THE COURT:  Yes, but, I mean, it's actually being

1    offered for another purpose is what Ms. Hamilton has told me.

2    It's being offered for the purpose of showing that this other

3    litigation was terminated in his favor in a manner consistent

4    with innocence.

5            MS. SHARIFI:  May I say something, your Honor?

6            THE COURT:  Yes.

7            MS. SHARIFI:  One thing, also, is that summary

8    suspension is not a termination of the underlying DUI

9    prosecution.  Mr. Dean --

10           THE COURT:  It's a separate case is what Ms. Hamilton

11   was saying.

12           MS. SHARIFI:  However, Mr. Dean's DUI prosecution

13   continued after summary suspension indicating that this non-

14   probable cause finding had to do simply with the termination

15   of his driving privileges absent from whether --

16           THE COURT:  I get that.  Summary suspensions are

17   determined by the secretary of state, right?

18           MS. HAMILTON:  Yes, but it's a separate --

19           THE COURT:  No, no, I understand.

20           So let me restate the argument because I want to make

21   sure I'm getting it right.  So what you're saying is that

22   Fiorito didn't just initiate one case.

23           MS. HAMILTON:  Correct.

24           THE COURT:  The DUI case.  He initiated two cases,

25   the DUI case and the summary suspension case.

1    MS. HAMILTON:  Correct.

2    THE COURT:  The DUI case we have had discussion about

3    how that was terminated and so on.  What you are saying here

4    is that, well, the malicious prosecution claim extends to both

5    of these things.

6    MS. HAMILTON:  Yes.

7    THE COURT:  And we want to prove that the summary

8    suspension case was terminated in his favor in a manner

9    consistent with innocence, and that's why the finding of the

10   hearing officer, or whoever it was, is pertinent.

11   MS. HAMILTON:  It's a judge.  It's the same judge

12   that --

13   THE COURT:  It's the same judge.

14   MS. HAMILTON:  It's a judicial proceeding.

15   THE COURT:  Judicial proceeding.

16   MS. HAMILTON:  Yes, it's a proceeding that is

17   instituted to revoke driving privileges, and it's a judicial

18   proceeding.

19   THE COURT:  What did they do, Ms. Jackson, take your

20   office away from you?

21   MR. ERICKSON:  It's separate and distinct.

22   THE COURT:  What about that?  I mean, facially at

23   least, that makes sense to me.

24   MS. ATKINS:  Well, your Honor, first and foremost,

25   isn't it the plaintiff who initiated the summary suspension

1  hearing?

2      THE COURT:  I don't know.  I mean, I assume that that

3  all flows from the fact that he gets a DUI ticket.

4      MS. HAMILTON:  Judge, the law enforcement's forum

5  report is what initiates, and it's not that the plaintiff

6  initiated.  The plaintiff did ask for a hearing, but the

7  proceedings to revoke his driver's license were initiated.

8      THE COURT:  Does that all happen because he didn't

9  take the Breathalyzer, or is it irrespective of whether he

10  takes the Breathalyzer?

11      MR. ERICKSON:  It's dependent upon that.

12      THE COURT:  So if he had taken the Breathalyzer --

13      In other words, not taking a Breathalyzer is a basis

14  for instituting a summary suspension.

15      MR. ERICKSON:  His refusal to take a Breathalyzer

16  causes the officer to fill out a form called a law enforcement

17  forum report and notices under suspension --

18      THE COURT:  That's what I've always understood.

19      MS. HAMILTON:  Right.

20      MS. ATKINS:  Your Honor, if I may, refusal to blow,

21  as I understand the relevant statutes, results in an automatic

22  suspension.  And so it's not that Officer Fiorito said, oh,

23  I'm going to fill out this paper.

24      THE COURT:  You're saying that Mr. Dean started the

25  summary suspension proceeding on himself?  Nobody is that

1    stupid.

2            MS. ATKINS:  Mr. Dean requested the summary

3    suspension hearing that Ms. Hamilton --

4            THE COURT:  He requested a hearing, but that's just

5    like saying, I want to go to trial on my criminal case.  That

6    doesn't mean he started the criminal case.

7            MS. ATKINS:  Sure.  But --

8            THE COURT:  Let me ask you this direct question.

9            MS. ATKINS:  Yes.

10           THE COURT:  What is it that you --

11           You don't have a summary suspension proceeding unless

12   you're charged with DUI, right?

13           MS. ATKINS:  Sure.

14           THE COURT:  He was charged with DUI by the ticket

15   that Officer Fiorito gave him, right?

16           MS. ATKINS:  Right.

17           THE COURT:  So Fiorito initiated the summary

18   suspension.  I think the plaintiff is right on this.  Okay.

19   So I'm going to give you a chance to think about it a little

20   bit more.  And if you have got something else to give me, I

21   will let you file a reply on that issue by Friday.  This is on

22   number 14.

23           MS. ATKINS:  Thank you, your Honor.

24           THE COURT:  Okay.  And that is all of the plaintiffs'

25   stuff, and I think actually we may be able to get through most

1    of the --

2           That's all of the defendants' motions.

3           MS. HAMILTON:  We filed one yesterday, Judge.

4           MS. ATKINS:  We did file --

5           THE COURT:  Oh, right, I saw that.

6           MS. ATKINS:  -- a 15th one.

7           THE COURT:  Right, right, right.

8           MS. HAMILTON:  Which basically is going to come up

9    anyways on plaintiffs' number 1, so you can kind of deal with

10   them at the same time, plaintiffs' first motion in limine

11   about arrests, subsequent -- prior and subsequent arrests.

12          THE COURT:  Pause for a second.  Let me just pull it

13   up here.  I didn't bring it out with me.

14      (Brief interruption.)

15          THE COURT:  Okay, relates to plaintiffs' motion in

16   limine number 1.  Now I get it.

17          MS. HAMILTON:  Yes.

18          THE COURT:  We'll take Defendants' 15 in connection

19   with the plaintiffs' motions in limine.

20          So the argument -- so plaintiffs' motion in limine

21   number 1 has to do with arrests that did not result in

22   convictions, which is also what defendants' motion in limine

23   15 concerns, right?

24          MS. HAMILTON:  Yes, Judge.

25          THE COURT:  Okay.  So articulate for me the theory on

1    which the arrest that didn't result in the conviction would be

2    relevant.  You have done it, but do it again here so that we

3    have something to set the scene.

4              MS. ATKINS:  Our argument is focused on Mr. Dean's

5    two arrests that took place subsequent to his arrest by

6    Officer Fiorito.

7              THE COURT:  Yes.

8              MS. ATKINS:  It has been Mr. Dean's position

9    throughout this litigation that he was not driving the vehicle

10   voluntarily, that he was forced to do so, that he blindly

11   follows the instructions of law enforcement.

12             The two subsequent arrests, one in May, I believe it

13   was May of 2011 -- or excuse me -- June of 2011 and the second

14   in May of 2012, both involved charges of --

15             THE COURT:  Trespass to property.

16             MS. ATKINS:  -- criminal trespass, and one was also

17   disorderly conduct in addition to the criminal trespass.

18             One was at a Starbucks; the other was at the

19   secretary of state's office, the administrative hearing

20   officer.

21             THE COURT:  So I'm going to assume that what happened

22   there is that -- particularly given the disorderly charge on

23   the one -- that Mr. Dean was in these places.  It wasn't like

24   he went in after hours or broke in or anything like that.  He

25   was there and there was some sort of a disturbance.

1          MS. ATKINS:  Absolutely, your Honor.

2          THE COURT:  So, in other words, it wasn't that he

3   didn't have authority to enter; it was he exceeded the scope

4   of his authority.

5          MS. ATKINS:  He outwore his welcome.  And when he was

6   asked to leave, he got, according to the reports, belligerent

7   and loud and aggressive and refused to leave, and it required

8   the police to remove him.

9          THE COURT:  Okay.  So this is what ties in with the

10  theory that you just articulated, is that you think that the

11  fact that he didn't leave when he was asked to at the

12  Starbucks and at the secretary of state's office has some

13  bearing on the accuracy or inaccuracy of his claim that he

14  followed Fiorito's instructions because Fiorito told him to.

15         MS. ATKINS:  No.  It's my argument, your Honor, that

16  while Mr. Dean says that he always obeys police officers and

17  law enforcement officers, and that's why he simply got into

18  the car, knowing that it was impounded, knowing that he didn't

19  have a right to drive the car.  Here he has two subsequent

20  instances where he didn't heed the direction of police

21  blindly.

22         THE COURT:  Then I'm guess I'm not getting it.  So

23  you're not tying it -- you're not saying that this is relevant

24  because it undercuts his account of what he did in the

25  incident.  You're saying that it's relevant -- and I'm looking

1    at page 2 of your motion right now, motion number 15.  You're

2    saying that it's relevant because -- or to the extent that

3    Mr. Dean gets on the witness stand and says that, because of

4    what happened to me here, I always do what law enforcement

5    tells me to do.

6            That's what the second paragraph on page 2 of your

7    motion says.

8            MS. ATKINS:  Well, your Honor --

9            THE COURT:  So which is it?

10           MS. ATKINS:  Let me just clarify.  Mr. Dean's

11   position has been, even before he interacted with Officer

12   Fiorito, that he always complied with law enforcement, and he

13   continued to act in that manner with Officer Fiorito, and

14   that's why he got into the car.

15           THE COURT:  I understand.  But you actually think

16   that the plaintiffs' lawyer is going to elicit from him -- I

17   mean, this would be like a "Law & Order" moment where the

18   person -- where the defense lawyer steps into the big bucket

19   of you know what, where the judge has already excluded all of

20   the other act evidence, and either the defense lawyer or the

21   defendant who is on the witness stand steps into the big

22   bucket of you know what when he or she says, oh I always do X,

23   Y or Z.  And then Jack McCoy stands up and says, aha, what

24   about, you know, the other four murders that you committed the

25   week before last.

1          Okay.  That's not likely to happen, all right, in

2    real life.  It doesn't -- you know, it doesn't even -- well,

3    it doesn't even happen in criminal cases, but whatever.

4          MS. ATKINS:  If I may, in addition to that, I

5    understand that you would expect it not to happen, but I would

6    have been remiss had I not --

7          THE COURT:  Well, and again --

8          MS. ATKINS:  -- brought it up.

9          THE COURT:  -- to the extent Mr. Dean, you know,

10   might tend to run on, as he has in court on a couple of

11   occasions, and I'm not talking about any settlement

12   conferences; I'm just talking about appearances in court.

13   Well, okay.

14          MS. HAMILTON:  Judge, clearly, if you just read the

15   actual words of their motion, they clearly are seeking to

16   introduce these subsequent arrests as propensity evidence.  It

17   basically just says that in the bottom of the second page of

18   their motion.

19          Dean says:  Plaintiffs' subsequent arrest for

20   criminal trespass and disorderly conduct, breach of peace, is

21   permissible to corroborate the defendants' position that the

22   plaintiff was acting in such an erratic and unreasonable

23   manner that a reasonable officer" blah-blah-blah.

24          THE COURT:  May I ask this question?  What became of

25   the June 2011 trespass and disorderly charge?  What became of

1  it?

2  MS. HAMILTON:  The most recent arrest is still

3  pending.

4  THE COURT:  The one in 2011.

5  MS. HAMILTON:  I think everything has been dismissed

6  except there's the most recent one is still pending.

7  THE COURT:  Okay.  So Mr. Dean presumably -- the one

8  that is still pending, let's put that to the side.

9  Presumably what Mr. Dean is going to say, if I let

10 you put this in, and you say, well, isn't it a fact, Mr. Dean,

11 that on June the 28th of 2011, you went into a Starbucks and

12 they asked you to leave, and then the police came and you

13 refused to leave and started screaming and yelling and

14 creating a disturbance, he's going to say, oh, no, that did

15 not happen that way.

16 All right.  So then what's going to happen?  Are you

17 going to call the cop?  Are you going to call the barista?

18 I'm just asking.

19 MS. ATKINS:  If I need to.

20 THE COURT:  Well, do you know who they are?

21 MS. ATKINS:  Yes.  They were the complainants, signed

22 complainants.

23 THE COURT:  Have they been subpoenaed for trial?

24 MS. ATKINS:  They have not.  I just received this

25 information yesterday.

1        THE COURT:  Okay.

2        MS. ATKINS:  Mr. Dean never supplemented any

3   information relative to his arrest.

4        THE COURT:  Is it correct that the June 2011, charge

5   was dismissed, SOL'd or whatever?

6        MS. ATKINS:  The May 2011 -- or June 2011 I have as

7   June 28th, 2011, SOL'd, bail bond forfeiture, SOL'd.

8        THE COURT:  Okay.  So the line on the half sheet, it

9   says BF/SOL, right?

10       MS. HAMILTON:  That means, Judge --

11       THE COURT:  I know exactly what it means.  Been

12  there, done that.

13       MS. HAMILTON:  The witness and the plaintiff didn't

14  show up.

15       THE COURT:  Nobody showed up.

16       MS. HAMILTON:  Right, right.

17       THE COURT:  Right, okay.  All right.

18       MS. ATKINS:  But, your Honor, if I may just also add,

19  it does go toward Mr. Dean's claims of emotional damages.

20       THE COURT:  In what way?

21       MS. ATKINS:  In the sense that, you know, if he --

22       Again, we're talking about ifs and buts here, and I

23  hate to do that, but it's hard to anticipate what Mr. Dean may

24  say.

25       But if he does start to talk about, I've never

1  behaved this way, I was so emotionally scarred by this

2  instance, I'm afraid of the police, I would never behave in

3  such a manner, I can't get out of bed, I can't do this, I

4  can't do that, and then he's --

5          THE COURT:  Okay.

6          MS. ATKINS:  -- arrested subsequently.

7          THE COURT:  Here's my view on this.

8          So putting aside testimony along the lines of what

9  you just described, I really do think that this is propensity

10 evidence.  It's nothing like any of the events that happened

11 here, you know, at least not close enough alike to be -- to

12 constitute modus operandi evidence or something like that or

13 anything else that make it a properly admissible thing under

14 404(b).

15         If, on the other hand, Mr. Dean, unthinkingly or even

16 thinkingly or something in between, says something at trial

17 along the lines of the "oh, I would never or I never have"

18 type of statement that you just described, then he potentially

19 will be opening the door to this.

20         And what the rule will be is just as I said to Ms.

21 Hamilton, if you think he's opened the door, you ask for a

22 sidebar, we discuss it at a sidebar.  And I'm going to assume,

23 just as you're going to talk to your witnesses about all the

24 little doors they may open, that you're going to do your best

25 to talk to Mr. Dean about all those little doors, and some not

1    so little, that may be opened and so on, okay.

2         So number 1 is granted subject to, you know, further

3    developments at trial, let's just put it that way.

4         Number 2, in-court statements while he was

5    unrepresented.  Well, what I got from the response to this

6    motion is you probably don't intend to put in any because the

7    response to the motion is what the heck are they talking

8    about.

9              MS. HAMILTON:  Exactly.

10             MS. ATKINS:  Well, we don't know what they're talking

11   about.

12             THE COURT:  Well, let me just say this.  So, first of

13   all, it doesn't appear to me that there's any intention to put

14   in any of this stuff.

15        Second of all, it's going to be -- it's going to be

16   relatively difficult, I will say, to convince me that you

17   should -- that you should allow Mr. Dean -- that I should

18   allow into evidence something that Mr. Dean may have said at a

19   status hearing or in connection with a motion to appoint

20   counsel or during the period of time that he was pro se.

21        You know, part of that may be I guess I wouldn't have

22   probably given him the judicial equivalent of the Miranda

23   warnings, not that they necessarily apply because he's

24   certainly not in custody and it's not a criminal proceeding,

25   but I just don't think that that would be particularly fair

1    because we were having, you know, what I think would be fairly

2    described as wide-ranging discussions, talking about what's

3    going on with this case, why don't you have a lawyer and

4    things like that, and I just don't think it would be fair to

5    then, you know, jam him with statements that he might have

6    made in that regard, plus you don't have anything specific

7    anyway.

8            Number 3.  So I'm assuming Fiorito isn't going to be

9    wearing a dress uniform since he's retired, right?

10           MR. KOWALCZYK:  Correct.

11           THE COURT:  And the response to this motion basically

12   said we're not planning to put that in unless, of course, all

13   of this stuff about prior misconduct comes in, in which case

14   we certainly reserve the right to say, wait a second, he has

15   gotten this accommodation and that accommodation.  I would

16   assume that if I allow in the prior evidence of bad conduct

17   that you wouldn't -- that you're not going to argue that he

18   can't put in the good stuff.

19           MS. HAMILTON:  Under the rules they can --

20           THE COURT:  Yes, okay.

21           So is there anything else that anybody thinks I have

22   to decide on that motion?

23           MS. HAMILTON:  No, Judge.

24           MS. ATKINS:  Your Honor, we had raised one issue

25   about -- because in the motion they had referenced Officer

1    Fiorito's personal experiences as being something that they
2    wanted to bar inclusion of or testimony regarding, and not
3    knowing exactly what it was that they were referencing with
4    personal experiences, I took the avenue in my response to
5    simply say his personal experience in his professional
6    capacity such as -- you know, his experiences that would lead
7    to the decisions that he made relative to Mr. Dean.

8              THE COURT:  So what is he going to say like that?
9              MS. ATKINS:  I don't know what.

10             THE COURT:  Well, we're three days before trial.
11   When are you going to know?  When are you going to know,
12   seriously?

13             MS. ATKINS:  Well, no.  Seriously, your Honor, if
14   we're talking about what led up to the probable cause, I think
15   that Officer Fiorito should certainly be able to talk about
16   the circumstances he faced with Dean and his personal
17   experiences in similar situations.  So it's more of his
18   professional experience relative to effectuating arrests,
19   assessing persons, et cetera.

20             THE COURT:  What else would you like to tell me?

21             MS. HAMILTON:  My only response to that, Judge, is
22   that, in my opinion, we could be walking a very close line to
23   opening a door if Officer Fiorito decides to testify about his
24   vast experience.

25             THE COURT:  Well, you're taking the words right out

1  of my mouth.

2          So here's the deal.  You know, I can certainly

3  understand circumstances in which how an officer perceives a

4  particular event might be influenced based on the officer's

5  experience, okay.  And so I don't think that I'm in a position

6  to say that it is not relevant.

7          Having said that, the more Officer Fiorito talks

8  about his experience, the more about his experience is going

9  to be relevant, and that includes bad as well as good.  And

10 so, again, I'm just going to --

11         And I haven't ruled yet on the other act stuff, but

12 let's assume for purposes of discussion that I end up

13 excluding the other act evidence, all of the other act

14 evidence, and some of it I've already excluded.  Who knows?

15 Officer Fiorito may say something in testifying about his, you

16 know, vast experience and what he's seen that might open the

17 door to some of the things that I have excluded.  So that

18 could happen.

19         I think as I sit here right now, I mean, my ruling is

20 I'm not prepared to say that every possible thing having to do

21 with his experience is irrelevant, so I'm going to deny the

22 motion, but, you know, people have to understand that doors

23 can get opened by anybody.  Okay.

24         So moving on, and we're going to try to finish this

25 here because we're actually pretty close.

1      MS. HAMILTON:  Okay.

2      THE COURT:  Number 3 -- number 4, rather, is can you

3  ask leading questions to police officers.  The answer is sure,

4  you can.  That's fine.

5      MS. HAMILTON:  Thank you.

6      THE COURT:  Number 5, failure to file tax returns.

7      So, I mean, if no evidence comes in about lost wages,

8  it tends to drop out of the picture, right?  And it sounds

9  like there is no evidence about lost wages because the

10  nonprofit stuff really isn't about wages.

11      MS. HAMILTON:  Right.

12      THE COURT:  So I think the tax return thing is a

13  nonissue.

14      And so what is the issue about Public Aid?

15      MS. HAMILTON:  If he is utilizing any right now, I

16  would just like it not to be asked about.

17      THE COURT:  Are you going to ask him about that?

18      MS. ATKINS:  I didn't even know he was utilizing it,

19  your Honor.

20      THE COURT:  I mean, even if you did, it would not be

21  a really particularly intelligent thing to ask because you

22  might have jurors who have friends, relatives and other people

23  who are under Public Aid and would be offended by that.  So

24  I'm going to assume that's not going to come up, and if it is,

25  just tell me before you do it so that I can deal with it.

1          Other lawsuits.  So the one thing here that I

2  thought, you know, had some potential relevance and probative

3  value is referred to on page 5 of the defendants' response.

4  It's a case called Dean v. Draper and Kramer in which Mr. Dean

5  allegedly said in a notice of appeal that he suffers from

6  clinical depression as a result of whatever it is he contended

7  that Draper and Kramer did to him.  And he was terminated, you

8  know, approximately around the same time as the incident in

9  this case.  And he's contending that he's suffered emotional

10  distress and depression as a result of what happens here.

11          So my question is:  Why wouldn't it be relevant for

12  the defendant to bring up in questioning Mr. Dean, well, you

13  have testified about all this depression; isn't it a fact that

14  you attribute your depression to conduct at the hands of your

15  former employer, Draper and Kramer?

16          MS. HAMILTON:  I think that just bringing up the fact

17  that there's a prior lawsuit is what I'm taking issue with.  I

18  understand, your Honor, what your reference is to, and that

19  does seem fair if it's part of his depression that had

20  something to do with this previous termination.  But that

21  would be enough.  We don't have to inform the jury that

22  involved a previous lawsuit.

23          I'm concerned about the jury hearing and believing

24  that Mr. Dean is litigious, and there's been case law that

25  that is unfairly prejudicial.  And so if your Honor is

1    inclined to let that in at all, I would ask that it be --

2             THE COURT:  So let me play it out for you this way.

3    Let's say what happens is that I agree with you and I say you

4    can bring up defendant's -- you can bring up that Mr. Dean has

5    attributed his depression to a different -- to the conduct of

6    his former employer, Draper and Kramer, okay.

7             And let's say if he says, yes, that's right, then

8    we're done.  If he says anything other than, yes, that's

9    right, then if he tries to hedge, or if he tries to explain,

10   or if he tries to say, well, that's different, then where are

11   we?  And that would --

12            Honestly, with any witness, there would be some risk

13   of that happening.

14            MS. HAMILTON:  Absolutely, Judge.  And, obviously, I

15   would endeavor not to open a door about the actual lawsuit.

16            I mean, I think that it would be fair to ask him, and

17   I would actually probably ask him myself to front it, that,

18   you know, that he also was depressed over having lost his job.

19   I think that's fair.  I think that that is a fair thing for

20   the defendants to get out, to be able to argue that his

21   depression that he suffered -- he's saying he's suffering from

22   the arrest by Fiorito may also have been, you know, partly

23   caused by this other event that has nothing to do with Officer

24   Fiorito.  That all seems fair to me.

25            What I would like to keep out and I think that there

1    is, you know, law to support --

2            THE COURT:  Let's say you do it that way.  Let's say

3    you front it on direct and you say, Mr. Dean, isn't it fair to

4    say that your depression is partly caused by the way you were

5    treated by your former employer, and he says yes.  Okay.  Why

6    wouldn't it be okay then at a minimum for the defendant on

7    cross to say, Mr. Dean, I just want to go back to that for a

8    second.  Didn't you actually say in writing that your, quote,

9    clinical depression has been a result of, close quote, what

10   your former employer did to you?

11           MS. HAMILTON:  Judge, I can't recall off the top of

12   my head right now whether that was something that was written

13   after the arrest.

14           THE COURT:  It's got a -- mark in it.

15           MS. HAMILTON:  Right, right, but was it something

16   that Mr. Dean wrote after his arrest by Officer Fiorito?

17           THE COURT:  Well, I would think so because the case

18   wasn't filed until after this one.  It's 09 C 4374, and the

19   appeal is presumably after that.

20           MS. HAMILTON:  Well, Judge, my response to that would

21   just be -- I mean, I think that, you know, depression doesn't

22   have to always be caused by one thing, and a layperson

23   submitting documents to the Court in that situation, I mean --

24           THE COURT:  That's a weight issue.  It's relevant,

25   okay.  So here's what I'm going to permit you to do.

1    MS. HAMILTON:  Okay.

2    THE COURT:  What I'm going to permit the defendant to

3  do is you -- at least without Mr. Dean in some way opening the

4  door to it, you cannot bring up the fact that there was a

5  lawsuit against Draper and Kramer because I think that is

6  unfairly prejudicial, and it's going to get us all down the

7  road into figuring out what that lawsuit is about.

8    You can bring up -- you can elicit that he has

9  claimed that his clinical depression was a result of what

10  Draper and Kramer did to him in connection with his

11  employment.  You can bring up that he has said that in

12  writing.  You can't bring up that he said that in a writing

13  that he filed in court because then that gets us into lawsuit

14  territory.  And that's the extent of what you can do.  Okay.

15    And even if the plaintiff brings this up on the

16  direct examination, you can still do it in cross because

17  you're not limited by the direct.  And if you think that

18  Mr. Dean says something either on the direct or on your cross

19  that should broaden the scope of what you can get into, you

20  will ask for a sidebar and I will address it.

21    MS. ATKINS:  Your Honor, just for point of

22  clarification, as to his depression, clinical depression,

23  being the result of his treatment from Draper and Kramer or

24  former employer, however --

25    THE COURT:  You can say Draper and Kramer.  I don't

1    care.

2              MS. ATKINS:  May I refer to the racial discrimination

3    as the treatment, not mentioning the claims in the lawsuit?

4    But he specifically alleged both with the EEOC and this Court

5    that it was racial discrimination.

6              THE COURT:  So you're asking me can you bring up,

7    isn't it a fact, Mr. Dean, that you have claimed that you were

8    clinically depressed as a result of race discrimination by

9    Draper and Kramer?

10             MS. ATKINS:  Yes, race discrimination and your

11   termination from Draper and Kramer.  He said he was terminated

12   because of his race.

13             MS. HAMILTON:  I would object to that, Judge.  I

14   think that your reasoning for allowing in the fact that he

15   said he has clinical depression is --

16             THE COURT:  What does the race discrimination aspect

17   add to it that's pertinent?

18             MS. ATKINS:  Well, your Honor, if he's alleging

19   racial animus or racial discrimination on the part of Officer

20   Fiorito --

21             MS. HAMILTON:  That's propensity.

22             THE COURT:  Let her finish the sentence.

23             MS. HAMILTON:  All right.

24             MS. ATKINS:  It's more of Mr. Dean's state of mind as

25   to how he is consistently treated by others.

1       THE COURT:  That's propensity evidence.

2       MS. ATKINS:  Yes.

3       MS. HAMILTON:  I'm sorry.

4       THE COURT:  Next time just let people walk into it,

5  you know, okay.  That's inadmissible.

6       Number 7, dismissed claims.  So I take it this is

7  only going to -- the thing about dismissed claims is only

8  going to come up, I take it, if I let in the other act

9  evidence?  Am I right?

10      MS. ATKINS:  I think it would just be Lopez.

11      THE COURT:  Yes, okay.  So we'll worry about that

12  once I rule on Lopez.  Somebody just needs to remind me.

13      MS. ATKINS:  The motion also has to do with prior

14  claims that plaintiff brought.

15      THE COURT:  You're not going to bring up claims that

16  he brought against Fiorito and the City and dropped, are you?

17  Mr. Kowalczyk.  Look at him.

18      MS. ATKINS:  No.

19      THE COURT:  No, okay, fine.  All right.

20      MS. ATKINS:  I just got confused for a second.

21      THE COURT:  Number 8, background checks.  I'm told in

22  the response that you're not going to do them.

23      You're not going to do the ones that lawyers for

24  police officers have done in a number of other cases that

25  involve use of the CLEAR, all capitals, database?

1       MS. ATKINS:  Not the CLEAR system, not LEADS, but if
2   there's Westlaw or --
3       THE COURT:  You're talking about doing normal sort of
4   Internet searches.
5       MS. ATKINS:  Exactly.
6       THE COURT:  You don't have a problem with that
7   because you can do those, too.
8       MS. HAMILTON:  No, Judge.  I just don't want them to
9   use --
10       THE COURT:  You're telling me you're not going to use
11   CLEAR and LEADS and so --
12       MS. ATKINS:  Absolutely.
13       THE COURT:  -- I'm taking your word for that.  So I'm
14   denying that motion based on that representation.
15       Number 9, ability to pay punitive damages, and the
16   defendant is saying we're not offering that.  And that ties in
17   with the issue about indemnification.  And so, you know, if
18   you think that the defense has done something that brings that
19   into play, you will let me know.
20       Okay.  So I've dealt with all the motions in limine,
21   I believe, except for the ones that I have tabled.
22       MS. HAMILTON:  Yes, Judge.
23       THE COURT:  And so you have in mind what it is you
24   have got to get me.
25       MS. HAMILTON:  Yes, Judge.

1         THE COURT:  I don't have it in my mind right now, but
2    I know that there's more.  We have got to do some more talking
3    about the other act evidence once you have gotten me the
4    police reports and the deps of the two people plus Mr. Dean's
5    police reports.

6         And I want to say there was one other thing.  Oh, you
7    were going to give me some law on whether --

8         MS. HAMILTON:  Proximate cause.

9         THE COURT:  Yes, law on whether lost opportunities as
10   a result of the lawsuit that he filed as a result of the
11   alleged wrongful conduct is recoverable.

12        So if you have got anything on that, get it to me by
13   Friday sometime.

14        MS. HAMILTON:  Okay, sure.

15        THE COURT:  And the other stuff you're going to get
16   to me -- the depositions and the police reports, you're going
17   to get me first thing in the morning.

18        MS. HAMILTON:  Yes, Judge.

19        MR. KOWALCZYK:  Yes, your Honor.

20        My clerk, she's going to get it to you.  We'll have
21   it for you tomorrow.

22        THE COURT:  Good.

23        MS. HAMILTON:  Judge, just really quickly.  There's
24   objections on the witness and exhibit lists that we need to
25   deal with still, and there is an issue where we need some

1   clarification on whether Officer Fiorito is going to be taking

2   the Fifth at trial, which we still don't know.

3            THE COURT:  Is he?

4            MR. KOWALCZYK:  It's my understanding that he is not,

5   Judge.

6            THE COURT:  Okay.  All right, so let's do this.  I

7   can't do anything more with you today.

8            MS. HAMILTON:  That's fine.

9            THE COURT:  You're going to have to come back

10  tomorrow.  I can't do it on Friday because I've got other

11  things that I kind of booked in for Friday, and I'm going to

12  have to sort of squeeze you in into a particular slot

13  tomorrow.  So let me tell you what that is.

14           MS. HAMILTON:  Okay.

15           THE COURT:  It's not pretty.

16        (Brief interruption.)

17           THE COURT:  So what we need to talk about, you're

18  saying, are objections to witnesses that aren't tied up with

19  the motions in limine that I have carried over.

20           MS. HAMILTON:  Yes.

21           THE COURT:  And then --

22           MS. HAMILTON:  There's exhibits that need to be ruled

23  on, too.  We have a disputed exhibit book for you, too.

24           THE COURT:  Okay, give me that.

25           MS. HAMILTON:  Judge, it's all in the pretrial order,

1      all of our objections and whatnot.

2            THE COURT:  Give me that and then come in at 10:30.

3            MS. HAMILTON:  I think the defendants have their own

4      exhibits.

5            THE COURT:  Yes, and I'm just going to tell you the

6      odds of me ruling before trial on all of this stuff is

7      relatively slim.  I may rule on some of it, but I'm probably

8      not going to rule on all of it before trial.

9            MS. HAMILTON:  Okay.

10           THE COURT:  So who wants to put in the "gentlemen,

11     this is vodka" sign?

12           MS. ATKINS:  That would be plaintiff.

13           MS. HAMILTON:  That's just a picture of the scene

14     where the car was.

15           THE COURT:  Okay.  You're not putting it in for the

16     sign, okay.

17           MS. HAMILTON:  The point isn't the sign.

18           THE COURT:  I mean, I don't know.

19           Okay.  So you have got copies of your disputed

20     exhibits?

21           MS. ATKINS:  Yes, your Honor.

22           THE COURT:  I'm telling you, it's the only two things

23     that are going to be on the agenda for tomorrow.

24           MS. HAMILTON:  10:30, right?

25           THE COURT:  10:30, and I will tell you more tomorrow

1    about other stuff regarding logistics and whatnot.

2         Okay, see you tomorrow.

3         MS. ATKINS:  Thank you, your Honor.

4         MS. HAMILTON:  Thank you, your Honor.

5    (Which were all the proceedings had in the above-entitled

6    cause on the day and date aforesaid.)

7                C E R T I F I C A T E

8

9         I hereby certify that the foregoing is a true and

10   correct transcript of the above-entitled matter.

11

12

13   */s/ Laura M. Brennan*                    August 17, 2012

14

15   _____         _____

16   Laura M. Brennan
     Official Court Reporter                  Date
     Northern District of Illinois

17

18

19

20

21

22

23

24

25